**FILED**

**September 10, 2009**

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002080172

Law Offices of Peter L. Fear
Peter L. Fear, No. 207238
Gabriel J. Waddell, No. 256289
7750 North Fresno Street, Suite 101
Fresno, California 93720
(559) 436-6575
(559) 436-6580 (fax)
pfear@fearlaw.com

Attorneys for Debtor in possession

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

| | |
|---|---|
| In re: | Case No. 09-17500-A-11 |
| ST JAMES AND ENNIS HANFORD INVESTMENT, LLC, a LIMITED LIABILITY COMPANY, | Chapter 11 |
| | D.C. No. PLF-3 |
| Debtor in possession. | Date: September 30, 2009<br>Time: 1:30 p.m.<br>Place: Dept. A, Ctrm. 11, 5th Floor<br>United States Courthouse<br>2500 Tulare St., Fresno, California<br>Judge: Hon. Whitney Rimel |

**EXHIBITS IN SUPPORT OF MOTION FOR AUTHORITY TO USE CASH COLLATERAL**

| Exhibit No. | Description | No. Pages |
|---|---|---|
| A | Appraisal | 69 |
| | | |

Index of Exhibits (etc.) - 1

# APPRAISAL REPORT

## VILLAGIO
### 302 ACRE PLANNED COMMUNITY
### 12TH AVENUE AND FARGO AVENUE
### HANFORD, CALIFORNIA

BORROWER: ST. JAMES AND ENNIS HANFORD INVESTMENTS, LLC

AS OF
## AUGUST 29, 2008

PREPARED FOR:

## CITIZEN'S BUSINESS BANK
## 7110 NORTH FIRST STREET
## FRESNO, CALIFORNIA 93720



**1306 NORTH IRWIN STREET
HANFORD, CA 93230**

# Simon Company, Inc.

(Bus) (559) 582-9112      1306 N. Irwin Street      (Fax) (559) 582-9114
Hanford, California 93230

September 9, 2008

Debbie Long, SVP
Construction Loan Manager
Citizen's Business Bank
7110 North First Street
Fresno, CA  93720

> Re: Villagio
> 302 Acre Planned Community
> Hanford, CA

Dear Ms. Long,

At your request, we have appraised a real property interest for the above real estate. Our objective was to form one or more opinions about the market value for a 100% ownership interest in the subject property's fee simple estate assuming no liens or encumbrances other than normal covenants and restrictions of record.

This valuation contains analyses, opinions, and conclusions along with market data and reasoning appropriate for the scope of work detailed later herein. It was prepared solely for the intended use and intended user explicitly identified in the attached report. Unauthorized users do so at their own risk. The appraisal is communicated in the attached Summary Report, and conforms to the version of the Uniform Standards of Professional Appraisal Practice (USPAP) in effect on this report's preparation date of September 9, 2008.

This letter is not an appraisal report hence it must not be removed from the attached 64-page report. If this letter is disjoined from the attached appraisal report, then the value opinions set forth in this letter are invalid because the analyses, opinions, and conclusions cannot be properly understood.

In general, valuation of the subject property involves no atypical issues. All value opinions are affected by all the information, extraordinary assumptions, hypotheses, general limiting conditions, facts, descriptions, and disclosures stated in the attached appraisal report. After careful consideration of all factors pertaining to and influencing value, the data and analysis thereof firmly supports the following final value opinion for the subject property as of August 29, 2008

<u>**Market Value As Is on the Appraisal Date**</u>
**Twenty Two Million Six Hundred Fifty Thousand Dollars**
**$22,650,000**

<u>**Market Value At Completion of Annexation, Zoning and Tentative Map**</u>
**Twenty Seven Million Dollars**
**$27,000,000**

Thank you for your business. Let us know how we may further serve you.

_____

Timothy J. Simon, MAI
Certified General Real Estate Appraiser
California License AG010007
License Expiration Date: 5/7/2009

# Table of Contents

**Scope of Work** ......................................................................................... 1
    *Introduction* ................................................................................ *1*
    *Assignment Elements* ..................................................................... *1*
    *Relevant Characteristics* ................................................................. *2*
    *Extent of Services Provided* ............................................................ *3*
    *Other Intended Use Considerations* ................................................. *4*
    *Miscellaneous Matters* .................................................................. *4*
    *Appraisal Development* ................................................................... *4*
    Report Reliance & Use Restrictions ................................................ 6
    Extraordinary Assumptions & Disclosures ...................................... 6
    Definition of Market Value ............................................................ 8
    Personal Property & Intangibles ..................................................... 9
    Professional Standards .................................................................. 9
    Competency ................................................................................. 9
    Contingent and Limiting Conditions ............................................... 9

**Area Data** ................................................................................................ 15
    Kings County .............................................................................. 15
    City of Hanford ........................................................................... 18
    North Hanford Sub-Market Area .................................................... 22
    Villagio Master Plan .................................................................... 23
    Market Analysis .......................................................................... 26

**Subject Property** ..................................................................................... 30
    Identification of the Property ......................................................... 30
    Legal Description ......................................................................... 30
    Ownership and Property History .................................................... 31
    Subject Photographs ..................................................................... 32
    Parcel Map .................................................................................. 35
    Description of the Site ................................................................... 37
    Environmental Risks .................................................................... 44

**Analyses & Conclusions** ......................................................................... 45
    Highest and Best Use .................................................................... 45
    Valuation Methods ....................................................................... 47
    Market Value As Is ...................................................................... 47
    *Market Sales* ............................................................................. *47*

Market Value at Completion of Annexation, Zoning and Tentative Map
Approval ............................................................................................................ 54
Exposure Time .................................................................................................. 57
Certifications .................................................................................................... 57

## Addenda ..................................................................................... 59

Digital Images ................................................................................................. 59
Appraisal Institute .......................................................................................... 59
Copyright Protection ...................................................................................... 64
End of Report ................................................................................................... 64

# ◈  Scope of Work

*Introduction*

The Uniform Standards of Professional Appraisal Practice (USPAP) defines scope of work as "*the type and extent of research and analysis in an assignment*". Scope of work includes, but is not limited to:

> ➢ the extent to which the property is identified;
> ➢ the extent to which tangible property is observed;
> ➢ the type and extent of data researched; and
> ➢ the type and extent of analyses applied to arrive at opinions or conclusions.

The appraised property includes two parcels of contiguous land with a total area of about 302 acres. It is presently used as farmland. The property is planned for a future urban master planned concept known as Villagio. Approximately 1,428 dwelling units are planned. Housing includes custom lots, production home lots and apartments. Approximately 135,000 square feet of commercial space is planned. There is 20 acres of open space and park, and a school and church site. The master plan for the project is moving the planning process. The appraisal will reflect two scenarios including an estimate of the "as is" value of the property and an estimate of the prospective value of the property at completion of annexation, zoning and tentative map approval.

*Assignment Elements*

The purpose of this assignment (the problem to be solved) is to form one or more opinions about value. This purpose necessitates identification of seven assignment elements listed below.

| | | |
|---|---|---|
| **1.** | The Client *(the person who engaged the appraisal and an intended user)* | Citizen's Business Bank |
| | Client's Interest In Property Appraised | Loan Related |
| **2.** | Other Intended Users | None |
| **3.** | Intended Use Of Report *(To aid)* | Underwriting A Real Estate Loan |
| **4.** | Standard / Definition Of Value Used To Form The Value Opinion | Market Value |

*Assignment Elements*

**5.**  Key Dates

| | |
|---|---|
| Effective Value Date<br>*(point in time the value applies)* | August 29, 2008 |
| Report Preparation Date<br>*(date the report was prepared)* | September 9, 2008 |
| Date Property Appraised Was Observed By One Or More Appraisers Signing This Report | Land Observed on August 29, 2008 |

**6.**  Assignment Conditions

| | |
|---|---|
| Extraordinary Assumptions | One Or More Apply, Detailed Later Herein |
| Hypothetical Conditions | One Or More Apply, Detailed Later Herein |
| Jurisdictional Exceptions | Not Applicable |
| Supplemental Standards | Not Applicable |
| Expected Public or Private On-Site or Off-Site Improvements Affect Value | Not Expected |
| Assemblage of Estates or Component Parts Affects Value | Not Expected |

*Relevant Characteristics*

**7a.**  *Physical*

| | |
|---|---|
| Existing Property Use | Vacant Land |
| Property Use Reflected In One Or More Value Opinions | Potential Residential Subdivision, Commercial and Multi-Family Land. |
| Sources of Information About the Property Appraised Included | Just An Exterior Observation; Online Public Records; Public Records In Government Office; Local MLS; Real Estate Brokers |

**7b.**  *Legal*

| | |
|---|---|
| Category Of Property Appraised | Real Property |

| | |
|---|---|
| Estate Appraised | Fee Simple |
| Legal Issues Considered | No Atypical Legal Issues |
| Environmental Concerns | No Known Environmental Concerns |

**7c.**  *Economic*

| | |
|---|---|
| Effect Of Leases On Value | Not Applicable |
| Cost Information | |
| Type of Reconstruction Cost Used | Not Applicable |
| Source of Reconstruction Cost Information | Not Applicable |

*Extent of Services Provided*

| | |
|---|---|
| Number of Final Value Opinions Developed | One |
| Value Opinion(s) Reflect The Worth Of the Property Appraised | As Is |
| Extent Of Report Preparation | Summary |
| Report Preparation Complies With Requirements Set Forth In USPAP Standard Rule | 2-2(b) |
| Other Reporting Requirements | Report Complies With FIRREA & Statement 10 of USPAP |
| Extent Of Data Research | Exhaustive |
| Data Sources | Local MLS; Private Data Provider Service; Public Records At Government Office; Online Public Records; Other Appraisers; Real Estate Brokers. |
| Documents Considered | Draft EIR, City of Hanford Master Plan Maps, Prior Appraisal dated July 25, 2007, Preliminary Title Report – First American Title Company, dated 11-3-05. |
| Data Verification | Direct Method |
| Extent Of Subject Observation By One Or More Appraisers Signing Report | Moderate Land Viewing |

## Other Intended Use Considerations

| | |
|---|---|
| Client's Prior Engagement Of Appraisal Services | Frequent |
| Loan To Value Ratio | Unknown |
| Atypical Issues | No Atypical Issues |
| Assignment Complexity | Complex |
| FIRREA Compliance | Fully Compliant |
| Insurable Value | Insurable Value Is Not An Intended Use |

## Miscellaneous Matters

| | |
|---|---|
| Other Than Signatories, Name Of Person Providing Significant Real Property Assistance To The Development Of The Value Opinion | No Real Property Assistance |
| Extent And Type Of Real Property Assistance | No Real Property Assistance |
| Scope of Work Agreement | Attached in the Addenda |

## Appraisal Development

Appraisal development is the extent of research and analyses that produce one or more credible opinions of value for one or more specifically identified intended users and an explicitly stated intended use. In this context, credible is defined as "worthy of belief".

Depending upon the intended use, intended users, and agreements between the appraiser and the client, the appraisal development process may include several, but not necessarily all of the following tasks.

> ➢ observation of the property appraised
> ➢ research for appropriate market data
> ➢ data verification
> ➢ consideration of influential market area, physical, economic, and governmental factors
> ➢ determination of the subject's highest and best use(s), if appropriate
> ➢ development of one or more applicable approaches to value
> ➢ reconciliation of value indications
> ➢ preparation of this report

In most cases, the core valuation process begins with a highest and best use analysis. This is essential because it establishes a framework for the proper selection of comparables. Cited comparables should have the same highest and best use as the property appraised.

If some property modification like new construction is contemplated, a feasibility analysis may be appropriate. In some cases, feasibility may simply be justified by inferred market evidence like low vacancy or rising rents.

According to USPAP, all approaches that are applicable to the interest being appraised and necessary to produce credible results must be developed. The type of highest and best use; extent of feasibility considered; and the relevance of each major approach are listed below.

| | |
|---|---|
| Highest and Best Use | An Fundamental Analysis |
| Feasibility Analysis<br>*(a more detailed study separate from highest & best use)* | Separate Feasibility Analysis Not Developed |
| Cost Approach | Not Applicable |
| Sales Comparison | Applicable And Included In Report |
| Income Approach | Not Applicable |

Paraphrasing the "*Appraisal of Real Estate*", 12th edition published by the Appraisal Institute, page 283 says feasibility analyses may involve data and considerations that are not directly related to highest and best use determinations. Such analyses may be more detailed, have a different focus, or require additional research.

Applicable and necessary approaches were selected for development after consideration of available market data, intended use, and intended user. An approach considered not applicable was omitted because this methodology is not appropriate for the property interest being appraised, or sufficient data to properly develop the approach was not available. Any approach judged not applicable, yet included in this report, was developed solely at our client's request. Data used to develop an inapplicable but included approach has a low to nil degree of comparability to the subject. Hence, no emphasis was given an approach deemed not applicable but included. Furthermore, no liability or responsibility is assumed for an approach considered not applicable but included at the client's request.

## Report Reliance & Use Restrictions

No liability is assumed, expressed, or implied by Simon Company, Inc., or the appraiser for unauthorized use of this report. Only those persons, parties, entities, companies, corporations, partnerships, associations, or groups that are clearly and explicitly identified as an intended user on page 1 may rely on, and use this report. There are no implied, suggested, inferred, consequential, or indirect intended users of this report. Unauthorized users should not use, or rely on any portion of this document. Unauthorized users do so at their own risk and peril.

## Extraordinary Assumptions & Disclosures

An extraordinary assumption is defined by USPAP to be "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinion or conclusions". Extraordinary assumptions presume as fact otherwise uncertain information. In other words, this type assumption involves uncertainty about an underlying premise. An example is a survey that displays a lot size. If the lot size is later found to be much smaller, then the value conclusion may be negatively affected.

USPAP Standard Rule 1-2(f) requires the identification of all extraordinary assumptions that are necessary for a credible value opinion. This appraisal has the following extraordinary assumptions.

➢ Features of the subject site such as legal description, dimensions, size, etc. were obtained from publicly available sources. All information taken therefrom is assumed reasonably correct.

➢ Details of the improvements thereon including yet not limited to various parcels maps, Master Plan material and tentative subdivision maps. All are assumed reasonably correct.

➢ Real estate tax information for the subject was obtained from an industry-accepted reporting service. All information from any credible source is assumed reasonably correct. Moreover, this information is assumed the most recent that is expeditiously available to the public.

> A public water system and public sewer main are near the subject parcel, or available near the subject's lot lines. This appraisal assumes these systems possess sufficient capacity to adequately serve the intended use of the subject improvements, if any. This appraisal also assumes the water is potable and non-contaminated. If these systems are inadequate to properly serve the subject's intended use, then the subject's value and marketability would be adversely affected.

> Assumptions and presumptions discussed in the Noteworthy Issues section of this report, if any, are incorporated by way of reference into these Extraordinary Assumptions & Disclosures.

> A title policy was furnished to the appraiser. If a value-impairment is identified or suggested in a title policy, another professional report, or some other document, this appraisal does not address issues that are significantly atypical for a valuation of this type property unless specifically identified in the Scope of Work and/or Noteworthy Issues section of this report.

These extraordinary assumptions are integral premises upon which the conclusion in this report are based. If any of these assumptions are later found to be materially inaccurate, then this report's conclusion may or may not be credible.

## Definition of Market Value

The following definition of *market value* was taken from regulations published by federal regulatory agencies pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989. Federal agencies publishing this definition, between July 5, 1990 and August 24, 1990, include the Federal Reserve System (FRS) as 12 CFR, parts 208 and 225; the National Credit Union Administration (NCUA); the Federal Deposit Insurance Corporation (FDIC); the Office of Thrift Supervision (OTS); and the Office of the Comptroller of the Currency (OCC) as 12 CFR, part 34, subpart C. This definition is also referenced in regulations jointly published by the OCC, OTS, FRS, and FDIC on June 7, 1994; and in the "*Interagency Appraisal and Evaluation Guidelines*", dated October 27, 1994. This same definition is also cited in Advisory Opinion 22 of the current version of the Uniform Standards of Professional Appraisal Practice (USPAP).

> *"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:*
>
> *1. buyer and seller are both typically motivated;*
>
> *2. both parties are well informed or well advised and acting in what they consider their own best interests;*
>
> *3. a reasonable time is allowed for exposure in the open market;*
>
> *4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*
>
> *5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."*

This definition is used by many legal jurisdictions. Fannie Mae, Freddie Mac, the VA, and the FHA, which are governmental agencies or governmentally sponsored agencies, require usage of this definition as well.

## Personal Property & Intangibles

Personal property is movable and **not** permanently affixed to the real estate. Examples of personal property are freestanding ranges, refrigerators, tables, desks, chairs, beds, linen, silverware, hand tools, and small utensils. An intangible is a nonphysical asset like franchises, trademarks, patents, goodwill, and mineral rights. Personal and intangible property included in this appraisal's value opinion, if any, is considered typical for this type real estate, yet insignificant to the value opinion. Therefore, non-realty is not itemized or valued herein. Moreover, this report's final value conclusion **excludes** unaffixed equipment, detached trade fixtures, and chattel unless specifically stated to the contrary.

## Professional Standards

All leading professional appraisal organizations, the U.S. Congress, all state legislatures, and numerous legal jurisdictions recognize the Uniform Standards of Professional Appraisal Practice (USPAP), promulgated by the Appraisal Foundation. Revised annually to keep it contemporary, these standards set forth ethical practices and proper procedures for a competent appraisal. This appraisal fully complies with all relevant portions of the USPAP version in effect on the date this report was prepared. It also complies with the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), a federal law.

## Competency

The person signing this report is licensed to appraise real property in the state the subject is located. I affirm I have the experience, knowledge, and education to value this type property. I have previously appraised similar real estate.

## Contingent and Limiting Conditions

By this notice, all persons, companies, or corporations using or relying on this report in any manner bind themselves to accept these contingent and limiting conditions, and all other contingent and limiting conditions contained elsewhere in this report. Do not use any portion of this report unless you fully accept all contingent and limiting conditions contained throughout this document.

Throughout this report, the singular term "Appraiser" also refers to the plural term "Appraisers". The terms "Appraiser" and "Appraisers" refer collectively to "Simon Company, Inc.", its officers, employees, contractors, and associate appraisers. The masculine terms "he" or "his" also refer to the feminine term "she" or "her".

These conditions are an integral part of this appraisal report, and are a preface to any certification, definition, description, fact, or analysis. Moreover, these conditions are intended to establish as a matter of record that the purpose of this report is to provide one or more value opinions for the subject property. All value opinions are prepared solely for the explicitly identified client and other explicitly identified intended users.

The liability of the Appraiser is limited solely to the client. There is no accountability, obligation, or liability to any other third party. Other intended users may read but not rely on this report. The Appraiser's maximum liability relating to services rendered under this engagement (regardless of form of action, whether in contract, negligence or otherwise) is limited to monies paid to Simon Company, Inc. for that portion of their services, or work product giving rise to liability. In no event shall the Appraisers be liable for consequential, special, incidental or punitive loss, damages or expense (including without limitation, lost profits, opportunity costs, etc.) even if advised of their possible existence. If this report is placed in the hands of anyone other than the client, the client shall make such party aware of all contingent and limiting conditions, assumptions, discloses, and related discussions. Use of this report by third parties shall be solely at the risk of the third party.

Value opinions involve only real estate, and inconsequential personal property. Unless explicitly stated otherwise, value conclusions do not include personal property, unaffixed equipment, trade fixtures, business-good will, chattel, or franchise items of material worth.

As part of this appraisal, information was gathered and analyzed to form value opinion(s) that pertain solely to one or more explicitly identified effective value dates. The effective value date is the only point in time that the value applies. Information about the subject property, neighborhood, comparables, or other topics discussed in this report was obtained from sensible sources. In accordance with the extent of research disclosed in the Scope of Work section, all information cited herein was examined for accuracy, is believed to be reliable, and is assumed reasonably accurate. However, no guaranties or warranties are made for this information. No liability or responsibility is assumed for any inaccuracy which is outside the control of the Appraiser, beyond the scope of work, or outside reasonable due diligence of the Appraiser.

Real estate values are affected by many changing factors. Therefore, any value opinion expressed herein is considered credible only on the effective value date. Every day that passes thereafter, the degree of credibility wanes as the subject changes physically, the economy changes, or market conditions change. The Appraiser reserves the right to amend these analyses and/or value opinion(s) contained within this appraisal report if erroneous, or more factual-information is subsequently discovered. No guarantee is made for the accuracy of estimates or opinions furnished by others, and replied upon in this report.

This appraisal is not an engineering, construction, legal, or architectural study. It is not an examination or survey of any kind. Expertise in these areas is not implied. The Appraiser is in no way responsible for any costs incurred to discover, or correct any deficiency in the property. In the case of limited partnerships, syndication offerings, or stock offerings in the real estate, the

client agrees that in case of lawsuit (brought by the lender, partner, or part owner in any form of ownership, tenant, or any other party), the client will hold Simon Company, Inc., its officers, contractors, employees and associate appraisers completely harmless. Acceptance of, and/or use of this report by the client, or any third party is prima facie evidence that the user understands, and agrees to all these conditions.

Unless specifically stated otherwise herein, the Appraiser is unaware of any engineering study made to determine the bearing capacity of the subject land, or nearby lands. Improvements in the vicinity, if any, appear to be structurally sound. It is assumed soil and subsoil conditions are stable and free from features that cause supernormal costs to arise. It is also assumed existing soil conditions of the subject land have proper load bearing qualities to support the existing improvements, or proposed improvements appropriate for the site. No investigations for potential seismic hazards were made. This appraisal assumes there are no conditions of the site, subsoil, or structures, whether latent, patent, or concealed that would render the subject property less valuable. Unless specifically stated otherwise in this document, no earthquake compliance report, engineering report, flood zone analysis, hazardous substance determination, or analysis of these unfavorable attributes was made, or ordered in conjunction with this appraisal report. The client is strongly urged to retain experts in these fields, if so desired.

For appraisals of multifamily property, only a portion of all dwellings was observed. A typical ratio of observed dwellings roughly approximates 10% of the total number of units, and this ratio declines as the number of dwellings grows. It is assumed the functionality, physical condition, and interior finish of unseen units are similar to the functionality, physical condition, and interior finish of observed units. If unobserved dwellings significantly differ from those that were viewed in functionality, physical condition, or finish, the Appraiser reserves the right to amend theses analysis and/or value opinion.

If this appraisal values the subject as though construction, repairs, alterations, remodeling, renovation, or rehabilitation will be completed in the future, it is assumed such work will be completed in a timely fashion, using non-defective materials, and proper workmanship. All previously completed work is assumed to substantially conform to plans, specifications, descriptions, or attachments made or referred to herein. It is also assumed all planned, in-progress, or recently completed construction complies with the zoning ordinance, and all applicable building codes. A prospective value opinion has an effective value date that is beyond or in the future relative to the report preparation date. If this appraisal includes a prospective valuation, it is understood and agreed the Appraiser is not responsible for an unfavorable value effect caused by unforeseeable events that occur before completion of the project.

This valuation may or may not include an observation of the appraised property by a signatory to this report. The extent of any observation is disclosed in the Scope of Work section of this report. Any observation by a signatory is not, and should not be misconstrued as a professional property inspection. Comments or descriptions about physical condition of the improvements, if any, are based solely on a superficial visual observation. Electric, heating,

cooling, plumbing, water supply, sewer or septic, mechanical equipment, and other systems were not tested. No determination was made regarding the operability, capacity, or remaining physical life of any component in, on, or under the real estate appraised. All building components are assumed adequate and in good working order unless stated otherwise. Private water wells and private septic systems are assumed sufficient to comply with federal, state, or local health safety standards. No liability is assumed for the soundness of structural members since structural elements were not tested or studied to determine their structural integrity. The roof cover for all structures is assumed water tight unless otherwise noted. Comments regarding physical condition are included to familiarize the reader with the property. This document is not an engineering or architectural report. If the client has any concern regarding structural, mechanical or protective components of the improvements, or the adequacy or quality of sewer, water or other utilities, the client should hire experts in an appropriate discipline before relying upon this report. No representations are made herein as to these matters unless explicitly stated otherwise in this report.

If this appraisal values an interest that is less than the whole fee simple estate, then the following disclosure applies. The value for any fractional interest appraised plus the value of all other complementary fractional interests may or may not equal the value of the entire fee simple estate.

An appraised property that is a physical portion of a larger parcel or tract is subject to the following limitations. The value opinion for the property appraised pertains only to that portion defined as the subject. This value opinion should not be construed as applying with equal validity to other complementary portions of the same parcel or tract. The value opinion for the physical portion appraised plus the value of all other complementary physical portions may or may not equal the value of the whole parcel or tract.

No liability is assumed for matters of legal nature that affect the value of the subject property. Unless a clear statement to the contrary is made in this report, value opinion(s) formed herein are predicated upon the following assumptions. (A) The real property is appraised as though, and assumed free from all value impairments including yet not limited to title defects, liens, encumbrances, title claims, boundary discrepancies, encroachments, adverse easements, environmental hazards, pest infestation, leases, and atypical physical deficiencies. (B) All real estate taxes and assessments, of any type, are assumed fully paid. (C) The property being appraised is assumed to be owned under responsible and lawful ownership. (D) It is assumed the subject property is operated under competent and informed management. (E) The subject property was appraised as though, and assumed free of indebtedness. (F) The subject real estate is assumed fully compliant with all applicable federal, state, and local environmental regulations and laws. (G) The subject is assumed fully compliant with all applicable zoning ordinances, building codes, use regulations, and restrictions of all types. (H) All licenses, consents, permits, or other documentation required by any relevant legislative or governmental authority, private entity, or organization have been obtained, or can be easily be obtained or renewed for a nominal fee.

The allocation of value between the subject's land and improvements, if any, represents our judgment only under the existing use of the property. A re-evaluation should be made if the improvements are removed, substantially altered, or the land is utilized for another purpose.

The Appraiser assumes a prospective purchaser of the subject is aware of the following. (A) This appraisal of the subject property does not serve as a warranty on the physical condition of the property. (B) It is the responsibility of the purchaser to carefully examine the property, and to take all necessary precautions before signing a purchase contract. (C) Any estimate for repairs is a non-warranted opinion of the Appraiser.

Any exhibits in the report are intended to assist the reader in visualizing the subject property and its surroundings. The drawings are not surveys unless specifically identified as such. No responsibility is assumed for cartographic accuracy. Drawings are not intended to be exact in size, scale, or detail.

Conversion of the subject's income into a market value opinion is based upon typical financing terms that were readily available from a disinterested, third party lender on this report's effective date. Atypical financing terms and conditions do not influence market value, but may affect investment value.

All information and comments concerning the location, market area, trends, construction quality, construction costs, value loss, physical condition, rents, or any other data for the subject represent estimates and opinions of the Appraiser. Expenses shown in the Income Approach, if used, are only estimates. They are based on past operating history, if available, and are stabilized as generally typical over a reasonable ownership period.

The Appraiser is not required to give testimony or appear in court because of having prepared this report unless arrangements are agreed to in advance. If the Appraiser is subpoenaed pursuant to court order, the client agrees to compensate the Appraiser for their court appearance time, court preparation time, and travel time at their regular hourly rate then in effect plus expenses. In the event the real property appraised is, or becomes the subject of litigation, a condemnation, or other legal proceeding, it is assumed the Appraiser will be given reasonable advanced notice, and reasonable additional time for court preparation.

Simon Company, Inc. and the Appraiser have no expertise in the field of insect, termite, or pest infestation. We are not qualified to detect the presence of these or any other unfavorable infestation. The Appraiser has no knowledge of the existence of any infestation on, under, above, or within the subject real estate. No overt evidence of infestation is apparent to the untrained eye. However, we have not specifically inspected or tested the subject property to determine the presence of any infestation. No effort was made to dismantle or probe the structure. No effort was exerted to observe enclosed, encased, or otherwise concealed evidence of infestation. The presence of any infestation would likely diminish the property's value. All value opinions in this communication assume there is no infestation of any type affecting the subject real estate. No responsibility is assumed by Simon Company, Inc. or the Appraiser for

any infestation or for any expertise required to discover any infestation. Our client is urged to retain an expert in this field, if desired.

Effective January 26, 1992, the Americans with Disabilities Act (ADA) - a national law, affects all non-residential real estate or the portion of any property, which is non-residential. The Appraiser has not observed the subject property to determine whether the subject conforms to the requirements of the ADA. It is possible a compliance survey, together with a detailed analysis of ADA requirements, could reveal the subject is not fully compliant. If such a determination was made, the subject's value may or may not be adversely affected. Since the Appraiser has no direct evidence, or knowledge pertaining to the subject's compliance or lack of compliance, this appraisal does not consider possible noncompliance or its effect on the subject's value.

All opinions are those of the signatory Appraiser based on the information in this report. No responsibility is assumed by the Appraiser for changes in market conditions, or for the inability of the client, or any other party to achieve their desired results based upon the appraised value. Some of the assumptions or projections made herein can vary depending upon evolving events. We realize some assumptions may never occur and unexpected events or circumstances may occur. Therefore, actual results achieved during the projection period may vary from those set forth in this report. Compensation for appraisal services is dependent solely on the delivery of this report, and no other event or occurrence.

No part of this report shall be published or disseminated to the public by the use of advertising media, public relations media, news media, sales media, electronic devices, or other media without the prior written consent of Simon Company, Inc. This restriction applies particularly as to analyses, opinions, and conclusions; the identity of the Appraiser; and any reference to the Appraisal Institute or its MAI, SRPA, or SRA designations. Furthermore, no part of this report may be reproduced or incorporated into any information retrieval system without written permission from Simon Company, Inc., the copyright holder.

## ❖ Area Data

### Kings County

The subject property is located in the City of Lemoore, which is located in the northwestern portion of Kings County. Located in the heart of the Central San Joaquin Valley in the State of California, Kings County takes its name from the Kings River, which was so named by an early Spanish explorer. It adjoins Fresno, Kern, and Tulare Counties, and has an area of 1,395 square miles, or 892,800 acres. The county was incorporated in 1893.



The January 2008 population estimate for Kings County was 154,434, which represented a 1.9% increase over the previous year. This was higher than the State average of 1.3%. The five-year population trend for Kings County can be summarized as follows:

| Year | Kings County | State of California |
|------|------|------|
| 2004 | 141,400 | 36,144,000 |
| 2005 | 145,110 | 36,728,196 |
| 2006 | 148,073 | 37,195,240 |
| 2007 | 151,607 | 37,559,440 |
| 2008 | 154,434 | 38,049,462 |
| 5-Year Growth Rate | 9.2% | 5.3% |

The economy of Kings County is based on two major pillars, agriculture and manufacturing. Some 84% of the land area in the county is used for agriculture. Oil production is much less than in the past, but is still important, and the Lemoore Naval Air Station, located on the west edge of Kings County, also contributes substantially to the economy.

Statistics pertaining to the Kings County labor force, as of March 2008 are summarized on the following chart:

| | |
|------|------|
| Total Labor Force | 59,600 |
| Total Employed | 52,800 |
| Total Unemployed | 6,800 |
| Unemployment Rate | 11.4% |
| *Top 3 Labor Industry Sectors:* | |
| Government | 34.0% |
| Agriculture | 17.0% |
| Retail Trade | 14.0% |
| Per Capita Income | $21,253 |

Agriculture is the mainstay of the county's economy, accounting for roughly $1,761,852,000 in farming receipts for 2007 according to the Kings County Agriculture Commissioner. This represented a 36.7% increase over the 2006 amount. It also set a single year production record for the County. Prior to 2006 the annual total had increased for five consecutive years since the decline from 1999 to 2000. Commodity prices have improved, which has been beneficial. Milk remains the top producer.

There are over 40 commodities that produce over one million dollars in income for Kings County. The top 10 commodities in terms of gross farm receipts are summarized in the following chart. No change took place in the top four commodities in terms of rank. In fact, all of this year's top 10 commodities were in the top 10 in 2006.

| Rank | Commodity (2006 Rank) | Gross Receipts |
|------|----------------------|----------------|
| 1 | Milk (1) | $692,185,000 |
| 2 | Cotton (2) | $234,836,000 |
| 3 | Cattle & Calves (3) | $161,296,000 |
| 4 | Alfalfa (4) | $85,593,000 |
| 5 | Pistachios (5) | $78,810,000 |
| 6 | Tomatoes (6) | $70,498,000 |
| 7 | Corn, Silage (7) | $49,273,000 |
| 8 | Almonds (8) | $48,220,000 |
| 9 | Walnuts (9) | $46,033,000 |
| 10 | Peaches (10) | $41,199,000 |

Over 45countries worldwide receive commodities grown in Kings County. The top ten are Taiwan, Mexico, Japan, Canada, Australia, Spain, China, United Kingdom, Peru and the Netherlands.

There is also a large military population in Kings County. Lemoore Naval Air Station is located just west of the City of Lemoore, which is approximately 10 miles west of the County Seat in Hanford. Commissioned on July 8, 1961, the original cost of the Naval Air Station exceeded $150 million. It is located on 20,000 acres in the northwest corner of Kings County.

Lemoore Naval Air Station is the largest master jet naval air station in the world and is designed to support more than 20 fleet carrier squadrons, and has the mission to serve as a master training center for carrier-based squadrons of the United States Pacific Fleet. The importance of this facility to the Kings County economy is evident in the following statistics:

| | |
|---|---|
| Active Duty Military | 7,000 |
| Civilian Employees | 1,100 |
| Contractors | 300 |
| Dependents | 20,000 |

Lemoore NAS is the home for the F/A-18E/F Super Hornet, the navy's newest and most advanced aircraft. It should be noted that Lemoore is one of the top two contenders being considered to become the West Coast home of the Navy's F-35 Joint Strike Fighters, the next generation of aircraft that would replace the Hornets. Lemoore NAS survived BRAC 2005 and will grow by 2 squadrons in the near future due to closures of other facilities. Each squadron includes approximately 1,200 active duty personnel plus their families.

The State prisons in Avenal, Corcoran and Coalinga have placed strong demand on housing and created the need for additional commercial services. These prisons as well as the Coalinga State hospital have added nearly 7,200 jobs in the area.

Home ownership continues to be steady in Kings County. Homes in Kings County are among the most affordable in the state. The average price for a three bedroom, two bath home in Kings County in as cited on the Multiple Listing Service was above $254,103. A wide variety of housing is available with single-family dwellings situated on city lots, rural acreage, sub-urban subdivisions, and in master planned communities.

In conclusion, the Kings County economy is tied to agriculture, but is becoming more diversified with new manufacturing and a growing government sector including the largest jet base on the west coast. In addition, new retail growth has also occurred. The population is growth has been consistent or slightly above the state average. These factors suggest stable property values into the foreseeable future.

## City of Hanford

Located in the northeast portion of the county, the City of Hanford is the County Seat for Kings County. The city is generally bounded by State Route 43 to the east, Flint Avenue to the north, 13th Avenue to the west and Houston Avenue to the south. The five-year population trend for Hanford is as follows:

| 2004 | 45,837 |
|---|---|
| 2005 | 47,827 |
| 2006 | 48,744 |
| 2007 | 50,459 |
| 2008 | 51,965 |
| 5-Year Annual Growth Rate | 13.4% |

The State of California prisons in Corcoran, Coalinga and Avenal have had a strong impact on the population trends in Hanford. Hanford has attracted a large percentage of this workforce. Most of the workforce is commuters who choose to live outside the prison cities. All three are within one hour of Hanford. The same can be said for the Lemoore Naval Air Station, which is 15 miles west. Hanford attracts a number of the civilian employees and the active duty personnel.

Another large employment draw locally is the Pleasant Valley State Prison, which opened in 2005. The mental health and treatment hospital was slated to include 1.2 million square feet with a total of 1,500 beds. This facility was further expanded in 2006 with the expansion slated to add 2,000 jobs. The facility has a significant presence in terms employment.

The median Income for Hanford is $33,879 while the average hourly wage is $16.29. By contrast, the average for the State of California is $40,415 annually and $19.43 per hour. Both figures are above the county wide average. The average unemployment rate for the City of Hanford in 2007 was 7.5%.



There are 18 manufacturing plants in the Hanford community area. Leading group classes of products are petroleum, flour, mill products, synthetic yard, fertilizers, micronutrients, and canned tomato products. The Kings Industrial Park is located on the south side of Hanford and includes the majority of Hanford's industrial base including Del Monte Foods (Contadina tomato processing), Union Camp (box and paper manufacturing), Walmart (photolab), Nutrena Feed (livestock feed), Calcot (cotton storage), and several small cheese plants. Del Monte Foods recently opened a 1.3 million square foot warehouse to serve the tomato processing facility. Del Monte acquired an additional 50 acres to the north of their facility for the expansion. The only major blemish was the Pirelli closure in January of 2001, which meant a loss of 500 good manufacturing jobs. The plant is listed for sale and remains vacant. However, on the positive

side it was recently announced that the plant was sold to an investment firm and will be leased out for warehouse space.



The Hanford area is served by the Burlington Northern and Santa Fe Railroad, the Southern Pacific Railroad, and Amtrak. Amtrak San Joaquin serves the San Joaquin Valley from Bakersfield to Sacramento with connections to the Los Angeles region and the Bay Area. Hanford has a small airport for light private aircraft. In October 2001, the City of Hanford received a grant from the FAA for $820,000 to facilitate an expansion of the airport. The runway was extended 1,200 feet, making it 5,000 feet. Commercial airline service is available in the City of Visalia, approximately 30 miles east of Hanford, and in the City of Fresno, approximately 45 miles northeast of Hanford. The Orange Belt bus lines provide bus service to Hanford. State Highways 198 and 43 serve the City of Hanford. Over 30 motor freight carriers service Hanford with overnight deliveries to most points in California.

The City of Hanford provides public water and sewer. A master plan has been adopted for storm drainage. The Southern California Gas Company provides natural gas while the Southern California Edison Company supplies electricity. Pacific Bell provides telephone service to the City.

Community facilities include two general hospitals, eight elementary schools, two middle schools, two high schools, one continuation school, three parochial schools, one adult school, two junior colleges within 25 miles, and California State University of Fresno only 45 miles to

the northeast. Culturally there are approximately 20 churches, one public library, two newspapers, six TV channels received direct and one cable TV system, nine banks, four credit unions, one savings and loan, six parks, three athletic complexes, and a Carnegie Museum. Other recreational facilities include the Kings Country Fairgrounds including Kings Speedway, one private 18-hole country club, two 18-hole municipal golf courses in neighboring Lemoore; and boating, fishing and hunting along the Kings River.

According to the Kings County Multiple Listing Service, the average sale price for a three-bedroom single-family residence in the City of Hanford for the last quarter was $259,192. This included a total of 49 transactions with an average time on market of 113 days. Hanford has some 14 active residential subdivisions available for new home sales. Apartments are available from subsidized rent levels to the luxury segment. Residential building permit activity is summarized as follows:

| 2003 | 445 Permits |
| 2004 | 428 Permits |
| 2005 | 563 Permits |
| 2006 | 479 Permits |
| 2007 | 267 Permits |

One of the reasons Hanford is attracting a number of workers from neighboring communities is the quality of life and availability of shopping and services. The Hanford Mall opened in April 1993 and features major retailers such as JC Penney, Mervyn's, and Gottschalks. A new Sears store and auto center opened in 1999. A Ross Dress For Less store in the mall in 2000. The mall includes an additional 166,000 square feet of in-line space including an eight-screen theater.

Major discount retailers are also present including Wal-Mart and Orchard Supply Hardware, two Rite Aid Stores and a Walgreens store. Home Depot opened a new store at the northeast corner of 12th Avenue and Lacey Boulevard. The 96,000 square foot store employs 150 to 200 people. Target recently opened their new store in the Mall area. Michael's, Famous Footwear, Old Navy, Cold Stone Creamery, and Jamba Juice joined them at this location. Wal-Mart recently opened a new super center just south of the Target site. A new Lowe's store is under construction northwest of Target on Lacey Boulevard. A new auto mall was completed on 37 acres at the northwest quadrant of 12th Avenue and State Highway 198. A Toyota dealership recently opened with a Hyundai dealership under construction.

The long-term outlook for Hanford appears positive. The survival of the Lemoore NAS during the recent military base closures and its continual expansion have helped to stabilize the local economy. The State prisons in Avenal, Corcoran and Coalinga have placed strong demand on housing and created the need for additional commercial services. The continual economic support from the agriculture community along with an emphasis on other job sources has a stabilizing effect on the local economy. Overall, population growth has been steady and has kept pace or bettered the County and State averages, which has a stabilizing effect.

## North Hanford Sub-Market Area

The sub-market area is generally located north of Grangeville Boulevard between 13th Avenue and Highway 43, and extending north to Flint Avenue. Flint Avenue serves are the north boundary of the city planning area. Douty Street is the main north-south arterial through the center of the city. Other main north-south arterials are 10th, 11th and 12th Avenue. East-west arterials include Fargo Avenue and Grangeville Boulevard.



North Hanford is primarily a residential district. The earliest development began north of Grangeville in the late 1950's to early 1960's. Home and apartment development has been steady through the years and continues today with six on-going residential subdivisions. Nearly all price points are present from an entry level PUD through custom lots. There is limited commercial development in the north Hanford market. The newest is a small center at Fargo and 11th Avenue, anchored by a Long's Drug. Another planned shopping center site is located at the southeast corner 12th Avenue and Fargo Avenue. A Fresh and Easy specialty store is planned for the northwest corner of 10th and Fargo. Major shopping is reserved for the regional commercial area at 12th and Lacey. The nearest grocery shopping is at Grangeville and 11th Avenue, which includes a center anchored by Savemart.

The subject is located on the northern fringe of development is Hanford. To the north and west is a transition to agriculture. To the south across Fargo Avenue is a two-tiered project developed by McMillin Homes. Lennar is completing its Coventry project. To the southwest is

Copper River, a 150 lot PUD project developed by Centex Homes. To the east is the Santa Fe railroad tracks followed Stonecrest, an attractive 5-10 year old project developed by Centex Homes.

Public facilities are in close proximity. Pioneer middle school is at Douty and Flint Avenue. Pioneer K-6 school at 14th and Grangeville requires a bus ride to one of two elementary schools in their system. Hanford High School is about a mile and a half to the south along Douty Street. There is a large city park at 11th Avenue, south of Fargo Avenue. In terms of public development on 13th Avenue south of Grangeville, the joint education complex is beginning to experience the initial construction of what will become a College of the Sequoias campus, new high school., K-6 school and city park. Pioneer School District just opened at K-6 school on 13th Avenue, north of Grangeville.

In general, property in north Hanford is newer than average. Homes prices are some of the highest in Hanford. It is well supported with public facilities, shopping and a desirable school district. The subject will have open land to the north and large lots to the south, both favorable traits for residential development of the subject.


## Villagio Master Plan

While the subject property is still being farmed as it has for many years, the owners have been doing substantial work over the past two years to master plan it for a new mixed-use project to be called Villagio. The owners are established developers and homebuilders in the Central Valley area and they have strong roots in the Hanford community. Working with the Sacramento planning firm of Bloodgood-Sharp-Buster, they have crafted one of Hanford's first large scale integrated plans for a new urban development. The plan has gone through several revisions in an effort to incorporate the input and desires of the owners /developers, the City of Hanford, and other potential stakeholders like the Pioneer Union Elementary School District, and it is now in a final version that has been submitted to the City for entitlements. Notice of Completion for the EIR was filed September 4, 2008. A public review period extends from September 4, 2008 to October 20, 2008. Planning and entitlements are indicated to extend into 2009.

The largest portion of the site area, covering approximately 205.30 acres or 68% of the land area, will be devoted to residential uses of various densities. At the upper end of the price scale, the project will offer some 60 lots of between 9,600 and 12,500 square feet devoted to estate style homes in a gated subdivision near the center of the site. The largest portion covering nearly 135.5 acres and 700 units will be for low density housing on lots of 3,875 to 7,700 square feet. A number of different subdivisions, likely offering a variety of house plans and designs, will be spaced throughout the project area at this density.

The medium density residential portions will cover another 29.3 acres and will provide an anticipated 305 units. These will include a mix of detached cluster homes and micro-lot urban houses. The high density residential sections will account for around 20.4 acres with nearly

363 units planned. They will consist mainly of townhomes and apartment projects. All of the medium and high density sections will be situated along the major perimeter streets of 12th Avenue and Fargo Avenue, and they will serve as buffers for the lower density residential subdivisions. Altogether, the residential sections of the project will accommodate some 1,428 new units at an overall density of 6.9 units per acre.

A very important aspect of the master plan project is the commercial portion. Planned for 11.6 acres at the corner of 12th Avenue and Fargo Avenue, the commercial will include a unique mix of traditional neighborhood-oriented shopping center with a food and drug store component as well as a main street section designed to be a community gathering place with restaurants, bakeries, coffeehouses, and retail stores.

Parks and open spaces have been strategically located throughout the project area to provide recreational opportunities, gathering spots, and to meet basic storm drain retention needs. Linear parkways and trails are also used to give a sense of connectedness amongst the various subdivisions. Overall, these open spaces will account for 35 acres or nearly 12% of the total land area. The remaining 20.6 acres of the project are set aside for public facilities, including a 13.2-acre school site in the center of the plan area and a 7.4-acre church site at the north end along Flint Avenue.

Phasing for the development has preliminarily been designed for a total of 23 phases. The earliest phases begin at the south end of the property along Fargo Avenue and progressively work north. This phasing is not finalized, however, and the owners have expressed a willingness to consider selling portions to other developers who would build simultaneously.



**MASTER PLAN MAP**

## Market Analysis

*Regional Pricing Trends:* Per Dataquick Information Services, the following pricing trends were evident for the surrounding counties as of July 2008. Kings County is not included in the surveys.

|  | July-08 | July-07 | 12 Mo. Change |
|---|---|---|---|
| *Fresno County* | $217,250.00 | $281,500.00 | -22.8% |
| Clovis | $282,000.00 | $377,250.00 | -25.2% |
| Fresno | $209,000.00 | $266,000.00 | -21.4% |
| Kerman | $199,750.00 | $291,000.00 | -31.4% |
| Reedley | $225,000.00 | $270,250.00 | -16.7% |
| Sanger | $210,000.00 | $271,250.00 | -22.6% |
| Selma | $192,500.00 | $260,000.00 | -26.0% |
| *Kern County* | $190,750.00 | $260,000.00 | -26.6% |
| Bakersfield | $197,750.00 | $273,250.00 | -27.6% |
| California City | $128,500.00 | $212,000.00 | -39.4% |
| *Tulare County* | $193,000.00 | $240,500.00 | -19.8% |
| Porterville | $186,000.00 | $203,000.00 | -8.4% |
| Tulare | $203,000.00 | $246,250.00 | -17.6% |
| Visalia | $199,500.00 | $255,500.00 | -21.9% |

In the four county region including Kern, Tulare, Kings and Fresno Counties, one real estate firm estimated that there are over 50,000 approved "paper" lots. A quick check of loopnet.com indicated there were over 10,000 paper lots on the market in the four county area and an additional 2,000 acre of residential land being marketed without entitlements. Plentiful land is available for sale in most markets.

*City of Hanford:* According to the Kings Multiple Listing Service, as of September 8, 2008, the following statistics were evident

| *City of Hanford* | 2007 Avg. | Jan-08 to Sept. 8, 2008 | % Change |
|---|---|---|---|
| Avg. Sales Price | $254,674 | $205,000 | -20% |
| Sales Total | 336 | 225 | 0.0% |
| Avg. Marketing Time | 117 days | 93 days | -20% |

The statistics indicate that home price have decreased nearly 20% since the start of 2008. Marketing times have decreased 20% since the start of the year. The sales rate is nearly identical to 2007.

*Building Permit Activity:*

| Year | Single Family Permits |
|------|------------------------|
| 2002 | 354 |
| 2003 | 445 |
| 2004 | 428 |
| 2005 | 568 |
| 2006 | 390 |
| 2007 | 254 |
| 2008, 7 months | 83 |

Like most California communities, permit counts spiked in 2004-2006. A substantial drop occurred in 2006 as market conditions and availability of financing deteriorated. The 2007 represents another substantial downturn. The annualized figure for 2008 (142 permits) represents a figure well below historical average for Hanford pre-boom. The historical pricing trends for Hanford are summarized as follows:



### Planned Projects – City of Hanford:

The following is a partial list of project that are partially completed or planned within the City of Hanford

| Name/Developer | Location | Lots | Status |
|---|---|---|---|
| Independence Lennar Homes | SWQ 12th Avenue and Grangeville | 245 lots on 75 acres | Sitework partially complete, no activity for 8 months |
| Live Oak Kemp Land | 12th & Hume | 1,560 D. U's on 390 acres | Master Plan Approved, TN for Phase I approved. No sitework completed. Southwest market. |
| Greenbrier Estates Kemp Land | South side Hanford-Armona Road, west of 12th Avenue | 98 lots on 18 acres | Tentative map, no sitework. Southwest market. |
| Sidonia II Lomarey Inc. | NEQ Hume & 12th Avenue | 61 lots on 5 acres | Tentative map, no sitework. Southwest market. |
| Villagio **(SUBJECT)** Ennis Homes | NEQ 12th and Fargo | 1,400 lots, 160K SF commercial on 300 acres | Master plan being reviewed by city. |
| Silver Oak Addition Centex | SWQ 12th & Fargo | 237 | TM Approved |
| Quail Park Ennis Homes | South side Flint Avenue, west of 11th Avenue | 144 lots on 52 acres | TM approved. |

To summarize the data

| | # Lots |
|---|---|
| Finished Lots Available | 575 |
| Blue Top Lots | 245 |
| Planned Lots | 3,376 |

**On-Going Projects:** Located on the following page is a summary of on-going subdivision projects in Hanford as provided by Hanley-Wood Market Intelligence.

The Meridian/Bordeaux and Coventry projects are directly south of the subject. Arbor Park is slightly east of the east side of the Santa Fe Railroad track on Fargo. Copper Valley is southwest

of the subject off 12th Avenue. The remaining projects are in south Hanford and are not comparable.

| | | | | | | | | Sold | | Sales Rate | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Project Name | Builder | Min Lot Size | Min Price Range | Detached Sqft Range | Price/Sft Range | Open Date | Units Planned | JAN-98 JUL-98 | FTD | JAN-98 JUL-98 | FTD |
| **Hanford - Detached** | | | | | | | | | | | |
| MERIDIAN AT THE VINEYARDS | McKillion Homes | 6600 | $223,990.00 - $321,990.00 | 1357 - 2466 | $121.45 - $143.06 | 5/30/2007 | 231 | 27 | 42 | 3.86 | 3.36 |
| ARBOR PARK | Enos Homes | 9500 | $196,990.00 - $280,990.00 | 1000 - 2164 | $129.64 - $199.59 | 9/04/2004 | 123 | 24 | 159 | 3.43 | 2.40 |
| COVENTRY | Lennar Homes | 6000 | $203,900.00 - $246,900.00 | 1423 - 2596 | $133.18 - $161.42 | 4/29/2006 | 64 | 19 | 80 | 2.87 | 1.63 |
| BORDEAUX AT THE VINEYARDS | McKillion Homes | 6200 | $269,990.00 - $276,990.00 | 2116 - 3376 | $112.68 - $138.62 | 7/28/2008 | 88 | 13 | 29 | 1.88 | 1.49 |
| VILLAS AT COPPER VALLEY (THE) | Cortex Homes | 3600 | $203,999.00 - $280,999.00 | 1168 - 2137 | $122.15 - $174.66 | 11/6/2006 | 160 | 13 | 48 | 1.95 | 2.36 |
| COUNTRYSIDE | Madison Chase Homes | 4100 | $222,990.00 - $264,900.00 | 1497 - 1696 | $136.69 - $161.09 | 4/7/2007 | 55 | 6 | 24 | 1.14 | 1.62 |
| SIDONIA ESTATES | Renous Communities | 6000 | $196,990.00 - $215,990.00 | 1115 - 1732 | $121.21 - $146.60 | 3/21/2008 | 134 | 7 | 7 | 1.74 | 1.74 |
| | | 6386 | $267,022.56 | 1842 | $142.48 | | 862 | 110 | 331 | 2.39 | 2.06 |
| **Grand Totals/Averages:** | | 6386 | $267,022.56 | 1842 | $142.48 | | 862 | 110 | 331 | 2.39 | 2.06 |

Active Projects
  Project Status
  Active

Data Current as of July 2008

The Hanford market is characterized by moderately decreasing home prices, increased selling times and a building inventory. Building permit activity has slowed in 2007, mirroring nearby communities. The undersupply condition during the boom period has now reversed itself to an over-supply situation. A multi- year inventory of approved or under-construction lots are indicated. The market for the new homes will be very competitive as the competing builders are typically large national and regional builders with large marketing budgets and incentive packages. With so many attractive projects for consumers to choose from, lower absorption rates, more incentives and continued downward pressure on prices are indicated. The land market is fairly static as builders are holding large inventories of land.

# ❖ Subject Property

## Identification of the Property

The property lies on the east line of 12th Avenue and extends east to the Santa Fe Railroad tracks. It extends to the south to Fargo Avenue and to the north to Flint Avenue. The property consists of two separate parcels of land identified by the following assessor's parcel numbers 007-010-031 and 007-360-016.

## Legal Description

The following legal description details the subject property.

### Southerly Parcel (APN 007-360-016):

The Southwest quarter of Section 14, Township 18 South, Range 21 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kings, State of California, according to the official plat thereof.

Excepting therefrom an undivided one-half interest in and to all oil, gas and other hydrocarbon substances and minerals in and under the land, as reserved in the Deed executed by Arthur William Morgan and Sadie Morgan, his wife, et al, and recorded July 24, 1951, in Book 499, Page 356 of Official Records, Kings County Records.

Also excepting therefrom those portions granted to the County of Kings in the Deed recorded February 25, 1965, in Book 868, Page 765, and in the Deed recorded January 20, 1967, in Book 900, Page 168, and in the Deed recorded January 22, 1998, as Instrument No. 98-1225, of Official Records, Kings County Records.

Also excepting therefrom the recorded railroad right-of-way over the Easterly 50 feet of said parcel.

Also excepting therefrom that portion of land conveyed to the City of Hanford, a municipal corporation, recorded January 23, 2004 as Instrument No. 04-1934 of Official Records, Kings County Records.

Also excepting therefrom that portion of land conveyed to BNSF Railway Company, as recorded April 17, 2007 as Instrument No. 07-10190 of Official Records, Kings County Records.

### Northerly Parcel (APN 007-010-031):

The Northwest quarter of Section 14, Township 18 South, Range 21 East, Mount Diablo Base and Meridian, in the County of Kings, State of California.

Excepting therefrom that portion described as: beginning at a point on the North line of said Section, 1454.75 feet East of the Northwest corner of said Section; thence South 365 feet to a point on the center line of People's Ditch; thence along said center line North 80°55' East, 31.7 feet and North 39°38' East, 468.7 feet to a point on the North line of said Section; thence West 331.3 feet to the point of beginning.

Also excepting therefrom the Easterly 50 feet.

Also excepting therefrom those portions of said land conveyed to the County of Kings in Document recorded December 17, 1964, in Book 865 at Page 297, Official Records, as Document No. 16126.

Also excepting therefrom that portion of land conveyed to BNSF Railway Company, as recorded April 17, 2007 as Instrument No. 07-10190 of Official Records, Kings County Records.

Also excepting therefrom all oil, gas and other hydrocarbon substances and minerals in and under said land.

## Ownership and Property History

Official Records of the County of Kings show title to the subject parcel to be vested as follows:

**St. James & Ennis Hanford Investment, LLC**
**643 North Westwood Street**
**Porterville, California 93257**

The current owners acquired title to the property by Grant Deed No. 05-36517, which recorded on November 3, 2005. This transfer was in settlement of a lawsuit that had been filed by St. James Construction against the original property owners Doris J. Verboon and William D. Verboon. The settlement called for a sale price of $20,000,000 or $66,138 per acre. This is not considered to be an arm's length transaction because of the nature of the lawsuit. Prior to this, the Verboon family had owned the property for many years.

There have been no other known transfers involving the property over the past three-year period. The property is not currently listed for sale or lease, although it has been leased on an interim year-to-year basis to a local farmer who continues to farm the property until it is ready for urban development. It is not listed for sale.

**Subject Photographs**



**West view across property from Santa Fe Railroad tracks**



**South view across walnut orchard and People's Ditch from Flint Avenue**



**Southeast view across property from 12th Avenue**



**North view across the property from Fargo Avenue**



**North view across former homesite area**



## Parcel Map





KINGS COUNTY ASSESSOR'S MAP
POR. S 1/2 SEC. 14-18-21

7-36

SUBJECT

# Description of the Site

**Property Address**:    No address

**Census Tract No.:**    1.00

**Physical Characteristics**:    According to an ALTA survey done in 2007 by the firm of Zumwalt-Hansen, Inc., the southerly parcel contains 149.944 acres and the northerly parcel has 152.459 acres. Altogether, the total property has approximately 302 acres of land area, more or less.

The property has public street frontage along the north side of Fargo Avenue of nearly 2,264 feet, on the east side of 12th Avenue of 5,296 feet, and across the south side of Flint Avenue of 2,350 feet. It is an unfinished site with virtually no off-site improvements installed along any of these frontages. There is a small amount of concrete curb, gutter, and sidewalk at the southwest corner of the property near the intersection of 12th Avenue and Fargo Avenue as well as some curb and gutter along the Fargo Avenue frontage near the BNSF railroad crossing.

The property is bordered along its entire eastern boundary line by the elevated tracks of the Burlington Northern and Santa Fe Railroad (BNSF). The tracks carry several trains per day, including BNSF freight trains and passenger trains operated by Amtrak. There is a passenger station serving the Amtrak line in Hanford some two miles southeast of the subject. The train will be a source of noise and dust. However, this will be mitigated through the use of landscaping and sound walls.

People's Ditch is an open waterway that runs across a portion of the northerly section of the property. It carries irrigation water deliveries to various farms throughout the area. The master plan for the Villagio project anticipates piping this ditch underground across the site.

Utilities:    The property is outside of the Hanford city limits and has only limited utilities and services available to it at this time. These services and their providers include natural gas from The Gas Company, electricity from the Southern California Edison Company, and telephone service from AT&T. Municipal services include police protection from the Kings County

Sheriff's Department, fire protection from the Kings County Fire Department in association with the California Department of Forestry, and street maintenance from the Kings County Public Works Department.

However, the City of Hanford Public Works Department has been planning for the eventual urban development of the subject's area for several years and their utility infrastructure has been designed to have adequate capacity. There is a 24" sanitary sewer line in 12th Avenue that has been extended to a point just 1,200 feet south of Fargo Avenue. This line is planned for ultimate extension all the way to Flint Avenue and it has sufficient capacity to serve the entire subject property.

Domestic water service will come from a 24" line in Fargo Avenue in front of the subject and from a 12" line in 12th Avenue to the south of the intersection. Again, these two lines have been designed with enough capacity to serve urban development on the subject. The City acquired a site near the southeast corner of the subject and recently built a new water pumping plant and storage tanks that will provide a good supply of water to the property. An additional well site is also envisioned by the master plan to the north along the railroad tracks.

**Topography, Drainage and Soils:**

Drainage of the property appears to be adequate and water typically percolates into the open soil. It does not appear that water from other adjacent properties would tend to runoff onto the subject. As part of the planned development of the property, two new large ponding basins will be established along the eastern side adjacent to the railroad tracks. They will handle all of the storm drainage needs of the project and will also serve as a buffer between the tracks and the homes. One of the basins will also double as a park.

The topography of the property is considered to be rough level and it sits at to slightly below the grade of the fronting streets. The property appears to be tiered at various points with a slight increase in height to the north. There has likely been some laser leveling for purposes of agricultural planting and irrigation, but it has not been formally leveled, compacted, and graded as necessary for urban development.

A *Geotechnical Investigation Report* dated April 28, 2006 prepared by Kleinfelder, Inc. of Fresno, California has been provided for review. The purpose of the investigation was to explore the site subsurface conditions and to provide recommendations and opinions to aid in project design and construction. Engineering staff performed a field exploration and drilled 60 test borings, and the extracted soil samples were then laboratory tested to evaluate their characteristics. For the most part, the soils consist of silty sand and clayey sand with a relative consistency of medium dense to dense. The borings went to a maximum of 21.5 feet deep and groundwater was not encountered at that depth. There are no anticipated geotechnical factors at the site that are unique and would necessitate special seismic design considerations.

**Easements or Encroachments**:

A preliminary title report dated May 22, 2007 prepared by First American Title Company has been supplied by the property owner for review. The southerly parcel appears to have several easements for street and railroad rights-of-way and utilities across portions of the property. The rights-of-way appear to relate to perimeter streets and the Union Pacific Railroad corridor, which have already been deducted from the gross land area, while the utility easements are typical of properties in the area and are necessary for serving the property with public utilities. The property also appears to be within the boundaries of the Excelsior-Kings River Resource Conservation District, and the title report excludes any claims to water rights.

The northerly subject parcel has many of the same types of rights-of-way and utility easements. In addition, there is a right-of-way for ditch purposes granted to the People's Ditch Company, which operates the open irrigation ditch traversing the property.

**Zoning**:

The subject property is currently outside of the Hanford city limits and land use is governed by the County of Kings. The County has zoned the entire property AL-10 as being within a Limited Agricultural district with a 10-acre minimum parcel size. This zone is intended to serve as a buffer around cities and communities between their urban areas and the more intensive rural agricultural uses of the county.

**General Plan:**   While the property is still outside of the Hanford city limits, it is within the City's current urban planning boundary, which makes it eligible for annexation. The application for annexation is in process.

Hanford's General Plan designates the majority of the property for Low Density Residential uses with only the northerly 630 feet designated for Very-Low Density Residential uses. The Low Density Residential classification allows for between two and nine units per gross acre, and it is designed for single-family residential development on lot sizes of 6,000 to 12,000 square feet that are typically found in urban settings. This generally corresponds to the City's R-1-6, R-1-8, and R-1-12 zones. Permitted uses in these zones include one-family dwellings; the raising of fruit and nut trees, vines, vegetables, and horticultural specialties; accessory structures and swimming pools; and domesticated animals.

The Very-Low Density Residential designation applies to larger estate-style lots of sizes from 15,000 to 20,000 square feet at densities of zero to three units per acre. The equivalent zoning is R-1-20, which is intended to provide a living area that combines the advantages of both urban and rural locations by limiting the density. Generally the same permitted, conditional, and administratively approved uses found in the Low Density Residential zones are allowed.

Proposed Amendments

Since May 2006, the property owners have been meeting with staff of the Hanford Planning Department in their efforts to master plan the Villagio project and obtain all necessary entitlements. Numerous meetings have been held and the design of the project has been revised several times to satisfy the City's desires and also the needs of Pioneer Union Elementary School District, who is seeking to acquire a school site within the project area. On June 28, 2007, the City issued a letter confirming that the owner's application for annexation, general plan amendment, pre-zoning, and planned unit development approval is complete, and that staff are moving forward to select a qualified consulting firm to prepare an environmental impact report (EIR) for the project. In a letter dated July 13, 2007, planning staff reiterated this and further indicated that due to the amount of pre-application work that was done they "expect that the processing of the applications, as far as staff reports and public hearings, will go smoothly."

In accordance with the master plan, the owners are seeking to change the general plan land use designations assigned to the property to include a mix of Low Density Residential, Very Low Density Residential, Medium Density Residential, High Density Residential, Commercial, Public Facilities, and Parks and Open Space.

By law, the City has one year to complete the EIR process, after which they will likely approve the annexation, general plan amendments, and pre-zoning. The annexation then is forwarded to LAFCO for their approval. During this time, the owners may be processing subdivision maps and readying them for recording once the annexation is completed. They anticipate being ready to record the initial final subdivision map and start construction on the initial phases of the project within approximately 18 months.

**Williamson Act:**    Both of the subject land parcels have Williamson Act contracts that have been in place since 1970, but Notices of Non-Renewal were recorded for both on December 19, 2006 (document nos. 06-37239 and 06-37240). This starts the 9-year process of termination.

However, the City of Hanford protested both of these preserves because portions of the two parcels were within one mile of the city limits at the time. According to the Kings County geographic information system, approximately 150 acres of the Southerly parcel and around 49 acres of the Northerly parcel were within the one-mile radius, so the protest was upheld for these portions. The owners indicate that the City will cancel the contracts on these portions immediately once the annexation is completed.

The remaining 103+- acres at the northerly end of the property was outside of the one mile radius and the City's protest was not upheld for this portion. The City has reportedly indicated a willingness to cancel this contract as well, but the owners will be subject to the $12^1/2\%$ penalty, which they intend to pay. They have budgeted $1,450,000 for this cancellation fee. Thus, all of the subject property should be free of the Williamson Act contract restrictions by the time that the property is ready for urban development.

**Flood Zone**:    According to the flood insurance rate map prepared by the Federal Emergency Management Agency for its National Flood

Insurance Program, the subject property is in an `X' flood zone. The applicable community panel number is 060086-0075-B which was most recently updated on August 4, 1988. The `X' flood zone denotes areas determined to be outside the 500-year flood plain. It is not considered to be a special flood hazard zone.

**Seismic Zone**: The subject property is located within Seismic Zone 3, Moderate Damage, Source: International Seismic Organization Earthquake Zone Maps dated 1981.

**Other Considerations:** Not in a wetlands area.

**Improvements:** Previously, the subject site had some minor house and barn structure improvements located in a small rural homesite along the Fargo Avenue frontage. However, these improvements have been cleared from the site and no more structures remain.

Large sections of the land have been planted with permanent nut tree orchards that are now in a mature condition. They along with the open land are irrigated by a series of groundwater wells and pumps with underground pipelines and valves. The land continues to be farmed in the interim pending the urban development of the property, but long term these improvements will be removed from the site to make way for the Villagio project.



**ALTA SURVEY MAP**

## Environmental Risks

*Disclosure*

During the course of this appraisal, the appraiser did **not** detect or attempt to discover any environmental hazard on, under, above, or within the subject real estate. No overt evidence of any environmental hazard is apparent to the untrained eye. It should be known the appraiser did not view the subject property with the intent of detecting any environmental hazard. It is beyond the expertise of the appraiser to detect or determine the chemical nature of any substance or gas. No effort was made to dismantle or probe any part of the property to discover enclosed, encased, or concealed hazards. No effort was exerted to ascertain the presence of any environmental hazard including but not limited to the following.

| | |
|---|---|
| *Asbestos* | *Urea-formaldehyde insulation* |
| *Underground storage tanks* | *Soil contamination or deficiencies* |
| *Lead-based paint* | *Toxic mold* |
| *Radon* | *PCB* |
| *Chemical spills* | *Fire resistant treated plywood (FRTP)* |

Flood hazards are detailed elsewhere in this report. Except as enumerated herein, the appraiser were not given the results of any environmental testing on or near the property being appraised. Neither observation of the subject property, or research conducted as part of a typical real estate appraisal suggest the presence of any hazardous substance or detrimental environmental condition affecting the subject. Nearby sites were not investigated to determine whether they are contaminated. Public information and other Internet sources were not researched to determine the presence of hazardous substances or detrimental environmental conditions in the subject's vicinity.

Federal, State, and local laws concerning any hazardous substance or gas are sometimes contradictory. Therefore, any needed clean up should comply with the most stringent laws. The appraiser are **not** informed or trained in environmental legalities. It is assumed no hazardous substance or gas adversely affects the subject real estate. If the subject is adversely influenced by a hazardous condition, then the subject's market value would be impaired.

*Recommendation*

The presence of any hazardous condition usually diminishes market value. The value opinion formed in this report assumes there is no environmental hazard affecting the subject real estate. No responsibility is assumed by the appraiser or Simon Company, Inc. for any hazard, or for any expertise required to discover any environmentally hazardous condition. Our client is urged to retain an expert in this field, if desired.

# ❖ Analyses & Conclusions

## Highest and Best Use

In the valuation of the subject property, consideration has been given to its highest and best use. The highest and best use analysis involved a study of the present use of the property, uses of surrounding properties, and zoning availability for the subject.

Highest and best use may be defined as follows:

> "The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value" *(The Appraisal of Real Estate, Edition, p.275)*

For highest and best use of both the land as if vacant and the property as if improved, a use must meet four criteria. The criteria for highest and best use are that the use must be physically possible, legally permissible, appropriately supported, and financially feasible. Usually these criteria are considered sequentially as it makes no difference that a use is financially feasible if it is physically impossible to construct the improvements or if such an improvement is not legally permitted.

The first criterion in determining the highest and best use is legal permissibility. The current AL-10 limited agricultural zoning applied to the property by the County of Kings is designed as a buffer or transitional zone between established urban areas of the city and more intensive rural agricultural areas that are outside of defined city limits. However, the property is within Hanford's urban planning boundary and is currently designated for a mix of low density and very-low density urban residential uses.

Over the past year, the property owners have worked closely with the City of Hanford and the Pioneer Union Elementary School District to design a master plan for the development of the property. The plan calls for a mix of single- and multifamily residential uses at a variety of densities and product types along with commercial, public facility, and open space uses. Full application has now been made for annexation, general plan amendment, pre-zoning, and planned unit development approvals. An EIR has been submitted and the project is in its 45 day review period.

The physical characteristics of the subject property are well suited to both continued agricultural production and urban development. The property is large enough in size to be considered a viable farming operation and the shape of the property is conducive to the growing of a variety of field or tree crops. The property is readily accessible from its extensive frontages on three public streets as well as from dirt farms roads that bisect the site.

From an urban development perspective, the property is larger than is typically acquired by local market participants, but it presents an opportunity for a sizeable master planned project, which has been gaining in popularity throughout the Central Valley in recent years. Utility infrastructure is available to the property with adequate capacity to serve a full urban buildout of the site. Soil conditions are reported to be stable and capable of supporting typical residential and commercial construction using slab-on-grade design. The presence of the adjacent railroad corridor and the open People's Ditch channel pose some minor problems, but they can be overcome with a variety of design measures.

The biggest question surrounding urban development, and particularly large-scale residential tracts, at this time is one of feasibility. While commercial property values have held up well over the past few years, residential values have exhibited much wider swings and at present are in a downward cycle. Declines in home prices and buyer demand have lead to falling land values and a drop off in demand from developers to acquire new sites. There is a definite imbalance between supply and demand with many Central Valley markets, including Hanford, having a multi-year supply of approved lots in inventory thanks to the number of subdivision maps that were proposed during the most recent up-cycle. Not all of these lots are in desirable areas or have the attraction of being in a master planned project, but they do tend to be a drag on the market and are pushing land values downward.

Projects such as the 389-acre Harlan Ranch in Clovis, the 688-acre Shannon Ranch in Visalia, and the 600-acre Del Lago in Tulare have been very well received by market participants, achieving absorption rates above those seen for other traditional projects, but they benefited from the strong market conditions that prevailed a few years ago. Still, the change in the market has not stopped developers from pursuing approvals for more master planned projects, and new large-scale developments are being worked on in Visalia and Hanford at this time.

The location of the subject property adjacent to existing urban development is making it less conducive to farming and as new housing continues to be built this situation will only worsen. The value of the property as transitional land far exceeds its value for agricultural production.

There is greater value to be created if the property continues to move towards entitlement for urban development. Much work has been done to position the property for this over the next 18 months and efforts should continue so that the annexation is completed, the zoning changed, and the master plan fully approved. It is hopeful that during the time required to obtain these approvals the market will begin to show some improvement and residential property values will stabilize. The potential exists for additional competition from other master planned projects in the Hanford area, but the subject is positioned with perhaps the best location and should fare well. This represents the highest and best use of the land as though vacant.

## Valuation Methods

There are three traditional approaches to estimating the value of an income producing property: the Cost Approach, Sales Comparison Approach and the Income Capitalization Approach. Each views the valuation problem from different perspectives and considers data from different sources. When possible, the appraiser should use all three approaches. Value estimates by each approach should be arrived at independently and tested against each other in order to provide a crosscheck. In some assignments, the data used in a particular approach may be more reliable, which would result in the estimate by that approach being the most logical and supportable. The strengths and weaknesses of each approach should be considered before selecting a final estimate of value for the subject.

The purpose of the appraisal is to estimate the "market value as is on the appraisal date." This will consist of an analysis of the property in its present condition as potential subdivision land. We will rely upon the sales comparison approach.

## Market Value As Is

*Market Sales*

The Sales Comparison Approach will be used to estimate the value of the vacant land. We searched the immediate Hanford market for transactions that were similar to the subject. With little success, the search was expanded to a regional area to find large blocks of residential land with physical and location characteristics that are similar to the subject. The following four sales were compared with the subject property and are summarized on the chart at the end of this discussion. All of the sales were considered arm's length transactions with no unusual sale terms. The sales were for cash or normal market financing.

Sale 1 is large parcel of vacant land located between 12th Avenue and Centennial Drive, just south of Grangeville Boulevard, in northwest Hanford. The property is open vacant land that had previously been farmed for many years. It is outside of the Hanford city limits, but has been general planned for low-density residential uses. New residential subdivision development by McMillin Homes is occurring on lands to the south. The property owner contacted several homebuilders who might be interested in purchasing it and they bid against each other until a price of $121,000 per acre was agreed to by Lennar. The sale closed to an investor who is holding the property on their behalf. While in escrow, Lennar made application for annexation and got the property pre-zoned R-1-6. They are also processing a tentative subdivision map. The property was developed to blue top and has been in that stage for nearly two years.

Sale 2 represents the bulk of the land for the new Harlan Ranch master planned project located at the southeast corner of Shepherd Avenue and DeWolf Avenue, in northeast Clovis. Harlan Ranch is one of the first master planned developments to be proposed in Clovis and it covers a total of 389 acres lying to the west of State Route 168. The plan calls

for a mix of land uses including 247 acres of single-family and multifamily residential land at various densities, 25 acres of commercial land that will include a main street design, a school site, and ample open spaces and linear parks. The bulk of the land totaling some 344.18 acres was owned by the Harlan family, with the balance held by other owners. A partnership of local developers comprised of Leo Wilson and Wathen-Castanos entered into agreements with the Harlan family in May 2003 to purchase all of their property. The agreement calls for a purchase price of $88,000 per acre for any portions purchased by May 2006 with the price to increase 10% each year through May 2009 for subsequent purchases. The buyers were given the right to purchase the property in as many as five phases of not less than 69 acres each. The property was outside and not adjacent to the Clovis city limits at the time, but it was within the City's sphere of influence. The land was raw with no off-site improvements in place and no utility services immediately available. Clovis had sufficient utility capacity to support the project, but the developers had to bring the utilities considerable distance at substantial cost. The buyers also agreed to process the annexation, general plan amendments, changes of zone, and master plan approvals for the project at their own effort and expense, which took over two years to complete. The buyers

## LAND SALES

| Sale No. | Location APN | Sale Date | Sales Price | Acres | Price/Acre Price/Lot | Utilities Zoning | Ag Preserve Annexed | Buyer Seller |
|---|---|---|---|---|---|---|---|---|
| 1 | West line 12th Avenue, south of Grangeville<br>Hanford<br>009-050-73 | 2/9/2006 | $9,089,641 | 75.00 | $121,195 | Yes<br>R-1-6 | No<br>Yes | Patrick Ricchiuti<br>John Souza |
| 2 | Harlan Ranch Master Plan Property<br>SEC Shepherd and Dewolf Avenue<br>Clovis<br>558-020-36, 37+ | 5/4/2005 | $30,287,840 | 344.18 | $88,000 | Extensions<br>Agriculture | No<br>No | CVEC Group Inc.<br>Floyd & Greg Harlan |
| 3 | Lowrey Ranch Master Plan<br>SWC Demaree St. and Avenue 320<br>Visalia<br>077-050-001, 003, 012 | Early 2007<br>Option | $19,698,000 | 151.53 | $129,994 | Yes<br>R-1 | No<br>Yes | Kemp Land Co.<br>David Baker |
| 4 | Eagle Meadows of Farmersville<br>SWC Visalia Road and Ventura<br>Farmersville<br>130-040-014, 020, 016 | 5/1/2006 | $9,780,080 | 91.79 | $106,548 | Yes<br>R-1 | No<br>Partial | Eagle Meadows<br>Hester/Beuhler |
|  |  | Listed | $7,500,000 | 91.79 | $81,708 | Yes<br>R-1 | No<br>Partial | ----<br>Eagle Meadows |

## Adjustment Grid

| Adjustments Price/Acre. | Subject ----- | Sale 1 $121,195 | Sale 2 $88,000 | Sale 3 $129,994 | Sale 4 $106,548 |
|---|---|---|---|---|---|
| Prop. Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Financing | ---- | Normal | Normal | Normal | Normal |
| Conditions | ---- | Normal | Normal | Normal | Normal |
| Date of Sale | ---- | Inf. (40%) | Inf. (30%) | Inf. (40%) | Inf. (40%) |
| Sub-Total | ---- | $72,717 | $61,600 | $77,996 | $63,929 |
| Location | Good | 10% | 0% | 0% | 15% |
| Offsites | None | 0% | 0% | 0% | 0% |
| Shape | Irregular | 0% | 0% | 0% | 0% |
| Size | 302.40 | -10% | 0% | -5% | -10% |
| Entitlements | In Progress | 0% | 10% | 10% | -10% |
| Utilities | Require Extensions | 0% | 0% | 0% | 0% |
| Total Adj. % | | 0% | 10% | 5% | -5% |
| Adj. Price/S.F. | | $72,717 | $67,760 | $81,896 | $60,732 |



eventually closed escrow on the Harlan parcels in multiple transactions between April 2005 and May 2006 at the $88,000 per acre price.

Sale 3 is Three adjoining parcels of land situated at the southwest corner of Demaree Street and Avenue 320, on the outskirts of Visalia. This property represents the northern end of the Lowrey Ranch master plan area and it is slated for development in the first two phases of the project. Lowrey Ranch covers a total of 572 acres and it will be a mixed-use development providing 2,196 units of single-family and multifamily residential, a neighborhood commercial site, a school site, and vast open spaces and water areas. This property represents 151.53 acres of the project area and it is slated for 595 housing units along with the school and park sites. This property was optioned to a developer in early 2007, and the agreement calls for it to be exercised and closed by May 2008. At that time, the property should be annexed into the city limits, rezoned to allow for the proposed uses, and tentative subdivision map approvals are expected to be in place allowing the project. The sale price is to be $130,000 per acre with the buyer to pay an additional $15,000 per acre for early cancellation of Williamson Act contracts.

Sale 4 was purchased in several transactions. APN's 130-040-014 & 020 were acquired from The Beuhler 1992 Family Trust as recorded in document #54925 on May 26, 2006. The total consideration for the property was $5,190,080. APN's 130-030-014 &016 were acquired from the Hester Family Limited Partnership as recorded in document #54924 on May 26, 2006. The total consideration for the property was $4,600,000. Both properties have extensive history in

farming. APN's 130-040-014 and 020 is planted in grain. There is a domestic well and pipeline on the property. The remaining two parcels are planted in a mature walnut orchard. Eagle Meadows purchased both properties with annexation and approved tentative subdivision map in place. No sitework has started on the proposed project. It is currently being farmed.

It is difficult to draw logical value conclusions from the sales data. The market experienced a residential boom starting in 2004 and peaking in late 2006. There is a lack of current transactions due to decreased demand and saturated existing supply by homebuilders. Further, many homebuilders are in unstable financial positions making land acquisitions difficult. Land listed for sale is fairly unrealistic in price expectations so it is difficult to determine a trend. It is clear that the residential market has suffered a downturn, mirroring the county and regional trend. Home and finished lot prices have decreased and, with decreased demand for land would suggest a decline in raw land value.

It may be useful to review some of the "knowns" in this market:

➢ Land on the fringe of the city used for agriculture sells in the range of $20,000 to $30,000 per acre. The subject is more valuable than this land.
➢ Pre-boom (2004) pricing for subdivision land was in the $30,000 to $40,000 per acre range. The subject should be more valuable than this.
➢ Land prices peaked in late 2006 at $150,000 to $250,000 per acre. Decreased home and lot prices and lack of activity on property listing would suggest this is currently not achievable.
➢ Early boom (2005) pricing was in the $75,000 to $100,000 range. At that point, there was not a huge premium being paid for an entitled property. At a later point in the boom, buyers were paying premiums for entitled property as a hedge to get houses on the market faster.

A positive factor for the subject that provides it with uniqueness is the master plan. Projects such as the 389 acre Harlan Ranch in Clovis, the 700 acre Shannon Ranch in Visalia and the 600 acre Del Lago project in Tulare have been very successful and in demand for their respective markets. There is only one other master plan pending in Hanford. Lone Oak is located in southwest Hanford and is a 390 acre project being planned by Kemp Land Company. The developer recently sold it to several key employees. It had decent interest in the market due to the nearly complete master plan.

An adjustment grid is used for factors that differ from the subject. The primary difference is in time of sale. The market experienced a significant uptrend in R-1 land values in the Fresno, Kings and Tulare market in 2004 to 2006, with the strongest upward movement being in the later half of 2005. The residential market turned in mid-2006. Homes prices and finished lot values are down significantly from 2006 levels. Therefore, the amount that can be paid for raw land is adversely affected. Speculation and premiums for tentative subdivision maps appears to be minimized.

For the time of sale adjustment we have used the Residual Technique which follows. We used a typical model used by a local builder at numerous projects in Kings, Kern and Tulare County.

As it is shown, the home price for the same model home in mid July 2006 has decreased 21.50% in mid 2008. The resulting impact on raw land value is something more like a 67% decrease. Reviewing both of these indicators, a 40% adjustment is used for 2006 sales, a 30% for 2005.

The adjusted range is from $60,732 to $81,896 per acre with an average of $70,776. In addition we have reviewed numerous properties available for sale in the market. The most pertinent are summarized as follows:

| No. | Location APN | Price | Acres | Price/Acre | Comment |
|-----|--------------|-------|-------|-----------|---------|
| L-1 | Taaj Ranch<br>SEC 7th Standard Road and Allen Road<br>Bakersfield, Kern County | $21,250,500 | 188.28 | $112,866 | Mixture of commercial and residential uses in growing northwest Bakersfield Cuurent zoning is AG, not annexed |
| L-2 | Wasco Valley Rose Master Plan<br>301 Leonard Avenue<br>Wasco, Kern County | $27,950,000 | 640.00 | $43,672 | 1,860 paper lots, 600,000 sq. ft. of retail land, golf course, 20 completed homes. Property is annexed and has utilities. |
| L-3 | Romero Ranch<br>Romero Road and Stine Road<br>Bakersfield, Kern County | $14,105,000 | 217.00 | $65,000 | Transitional land contiguous to the City of Bakersfield. Requires annexation, zoning and TM approvals. |
| L-4 | 3500 Irone Avenue<br>Rosamond, Kern County | $28,000,000 | 330.00 | $84,848 | 1,225 units and 10 ac commercial property Annexed and with TM |
| L-5 | Highway 33 Master plan<br>Coalinga, Fresno County | $11,500,000 | 99.03 | $116,126 | Final stages of approval/annexation with city. Mixed use commercial and residential master plan. |
| L-6 | NWC Avenue 9 & Road 40-1/2<br>Madera, Madera County | $35,500,000 | 355.00 | $100,000 | 1,384 SFR lots, 670 attached units, commercial. Zoned agriculture, entitlement process underway In Rio Mesa planning area. |
| L-7 | Bellevue and Golf Road<br>Merced, Merced County | $11,375,000 | 65.00 | $175,000 | In final stages of annexation and pre-zoning. Includes residential and commercial land uses. One mile from UC Merced campus |

**Land Listings**

The Kern County properties (L-1 through L-4) generally set the lower end of the ranges. This market is over-built with substantially amount of land and lots on the market. The Wasco market in particular is heavily impacted which has impacted the asking price for Sale 2. Listing 5 in Coalinga seems fairly unrealistic for the size and depth of the market. Listing 6 would appear fairly similar to the subject. Listing 7 is located near UC Merced, an area of higher land values.

There are a lot of planned lots in the subject market. Logically, the development pace of the finished lots will determine the demand for developed land. With a general slowdown in home sales and so many finished lots, the need becomes less and the value follows. As such, we believe the "as is" value of the property is about $75,000 per acre or about $22,650,000, rounded.

# Land Residual - Ennis Homes Model 1494

| | | July 2006 | | | June 2008 | | Decrease 06 to 08 |
|---|---|---|---|---|---|---|---|
| | Size | Price/SF | Value | Size | Price/SF | Value | |
| **Home Price** | 1494 | $200 | $298,800 | 1494 | $157 | $234,558 | 21.50% |
| **Less Cost for Improvements** | 1494 | $97 | $144,918 | 1494 | $95 | $141,930 | |
| **Less Lot Development Cost** | | | $40,000 | | | $40,000 | |
| **Less Profit** | 35% | | $64,721 | 20% | | $36,386 | |
| **Residual to Paper Lot Value** | | | $49,161 | | | $16,242 | |
| **Project Denisty** | 4 | | | | 4 | | |
| **Price/Acre** | | | $196,643 | | | $64,968 | 66.96% |

## Market Value at Completion of Annexation, Zoning and Tentative Map Approval

In 2004-06, substantial premiums were paid for entitled land. Participants paid premiums of 2-3 times base land value to gain entry into boom market conditions for home sales.

In the post boom market, there is substantial entitled land available. Home sale have slowed drastically and demand for land is low.

The conditions present would suggest that substantial premiums for entitled land are not present. Offsetting this to a degree are several positive factors:

- The subject is the last large block of land in northwest Hanford, the primary segment of the market reflecting highest absorption and home values.
- The subject will have a master plan with a designated, orderly land use pattern reflecting integrated open space, trails and school sites.
- The subject is located in a favorable school district that remains in demand.

We do not have any specific market data to demonstrate the impact of having an approved master plan/tentative map. Logically speaking, it is safe to assume that several of the first phases of R-1 land and maybe one of the apartment sites might have some short term development potential. The commercial parcel is fairly premature at this point due to the lack of development to the west and north. There is also substantial approved commercial land at the southeast corner of Fargo and 12th Avenue. A new center recently opened one mile east at 11th and Fargo, which is still in the absorption phase. A Fresh and Easy store is planned or 10th and Fargo.

One of the few indicators for the subject is a fairly recent offer for the Live Oak project in south Hanford. There was a recent offer for the 344 acre project is master planned for 1,361 dwelling units. An institutional based investor group offered approximately $17,000 per dwelling unit for the project. The property is annexed and zoned. Current projections indicate approval of the master plan, Phase I and II tentative maps, development agreement and certification of the EIR are pending based upon payment of fees. The property was subsequently purchased by a few former partners of Howard Kemp for $8,550,000 cash plus the amount they already had invested in the property (an amount not disclosed). Comparing this property to the subject – it has an inferior location and does not contain any commercial land. However, it is further along in the development timeline than the subject. Like the subject it has school site and open space included.

Using this indicator as a rough comparison, the subject contains 1,428 dwelling units. At a price of $17,000 per dwelling unit equals $24,276,000. The subject also includes 11.6 acres of commercial land at the corner of 12th and Fargo. The chart which follows was used as a basis for the commercial land. At a value of approximately $5.00 per square foot, the 505,296 square foot site is worth $2,526,000 (rounded). A total property of $27,000,000 (rounded) is indicated.

This represents an 18.3% premium over the "as is" value of the property. This is quite a bit less than premiums seen in 2004-06 however market conditions are entirely different. Some of the subject's entitlement progress is already priced into the "as is" value. The subject is fairly well into their entitlement process.

To summarize, we believe the property reflects the following values:

**Market Value As Is on the Appraisal Date**
**Twenty Two Million Six Hundred Fifty Thousand Dollars**
**$22,650,000**

**Market Value At Completion of Annexation, Zoning and Tentative Map**
**Twenty Seven Million Dollars**
**$27,000,000**

# COMPARABLE LAND SALES

| No. | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 |
|---|---|---|---|---|---|
| Location | S.S. of Lacey Blvd. west of 12th Avenue, Hanford | Hanford Auto Mall, Lot 2, Hanford | Hanford Auto Mall, Lot 1, Hanford | Hanford Auto Mall, Lot 3, Hanford | 12634 13th Road, Hanford |
| APN | 018-102-007 | 018-102-126 | 018-102-125 | 018-102-127 | 018-102-084 |
| Buyer | Centennial-Hfd. Ctr. West | New Rooms Ent. | Windemere | Serpa | ------ |
| Seller | Hanford Investments | Hanford Development Inc. | Hanford Development Inc. | Hanford Development Inc. | Kings EV Free Church |
| Sale Date | Nov-06 | Sep-06 | Jun-06 | Feb-06 | Listing |
| Sale Price | $5,471,000 | $1,568,500 | $1,854,000 | $1,765,356 | $1,306,800 |
| Price/S.F. | $5.77 | $9.00 | $8.35 | $7.90 | $6.00 |
| Size, Acres | 21.75 | 4.00 | 5.10 | 5.13 | 5.00 |
| Size, S.F. | 947,430 | 174,240 | 222,156 | 223,463 | 217,800 |
| Zoning | AG (GP of PO) | S-C | S-C | S-C | S-C |
| Off-Sites | None | Curb & Gutter | Curb & Gutter | Curb & Gutter | None |
| Utilities | W, S, G, E | W, S, G, E | W, S, G, E | W, S, G, E | Well, Septic, Elect. |
| Future Use | Future Lowe's | Hotel | Hotel | Auto Dealer | Vacant Church |
| Sale Conditions | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Financing | Conventional | Conventional | Conventional | Conventional | Conventional |

***Data Summary - Price/Square Foot:***

| | | | *Low* | *High* | *Average* |
|---|---|---|---|---|---|
| | | | $5.77 | $9.00 | $7.40 |

## Exposure Time

Terminology abounds in the real estate appraisal profession. Two related but different concepts that are often confused are Exposure Time and Marketing Time. USPAP specifically addresses the confusion.

| Term | Definition | Explanation |
|------|-----------|-------------|
| Exposure Time (Statement 6) | *"... the estimated length of time the property interest being appraised would have been offered on the market **prior** to the hypothetical consummation of a sale at market value on the effective date of the appraisal".* | Backward looking; ends on the effective value date. Based on factual, past events. |
| Marketing Time (Advisory Opinion 7) | *"... an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value during the period immediately after the effective date of the appraisal".* | Forward looking; starts on the effective value date. A forecast based on expectancies of future occurrences. |

Marketing time and exposure time are both influenced by price. That is, a prudent buyer could be enticed to acquire the property in less time if the price were less. Hence, the time span cited below coincides with the value opinion(s) formed herein.

USPAP Standard rule 1-2(c)(iv) requires an opinion of exposure time, not marketing time, when the purpose of the appraisal is to estimate market value. In the recent past, the volume of competitive properties offered for sale, sale prices, and vacancy rates have fluctuated little. Sale concessions have not been prevalent. In light thereof, an estimated exposure time for the subject is 9 to 12 months assuming competitive pricing and prudent marketing efforts.

## Certifications

The appraisers signing this report make the following certifications to the best of their knowledge and belief.

➢ The statements of fact contained in this report are true and correct. Reported analyses, opinions, and conclusions are limited only by the assumptions and limiting conditions contained within this report, and are the appraisers' personal, impartial, and unbiased professional analyses, opinions, and conclusions.

➢ The appraisers have no present or prospective interest in the property that is the subject of this report, or personal interest with the parties involved. The appraisers have no bias with respect to the property that is the subject of this report, or to the parties involved with this assignment.

➢ This engagement was not contingent upon developing or reporting predetermined results. Compensation paid to the appraisers is not contingent upon the development or reporting of a predetermined value, or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of the appraisal.

➢ Reported analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) as promulgated by the Appraisal Foundation.

➢ A statement regarding observation of the subject property by the appraisers is listed below. This viewing, if any, did not attempt to probe, study, investigate, detect, or discover unfavorable physical features.

| Appraisers | Observations |
|---|---|
| Timothy J. Simon, MAI | Moderate Land Viewing |

➢ Names of individuals providing significant real property appraisal assistance to the persons signing this certification: No Real Property Assistance

Timothy J. Simon, MAI
Certified General Real Estate Appraiser
California License AG010007
License Expiration Date: 5/7/2009

# ❖ Addenda

## Digital Images

Our world is rapidly shifting to a global economy in which technology and e-commerce play major roles. Digitized signatures and digital photographs are key elements of this shift. This appraisal may contain digital photographs, which are true and accurate representations. Brightness and/or contrast of these images may have been adjusted to enhance visibility when lighting conditions were too light or too dark. However, the content of these images was not altered or augmented in any way.

Digital signatures may be affixed to this document. Statement 8 of USPAP recognizes and addresses the proper use of digitized signatures. In this document, a digital signature is a reproduction of the appraiser's actual signature. Software used for the affixation has a password security feature, which controls its usage.

## Appraisal Institute

The Appraisal Institute, the professional organization that awards the MAI and SRA appraisal designations, conducts a program of continuing education only for its designated members. Associate and Affiliated Members may attend educational courses and seminars, but they do not receive continuing education credit from the Appraisal Institute.

## Declarations

**The appraiser is a designated member of the Appraisal Institute who declares he / she has completed the continuing education program prior to this report's preparation date.**

| Appraiser | Declaration |
|---|---|
| Timothy J. Simon, MAI | Completed |

Signatories to this report, who are Appraisal Institute designated members, associates, or affiliates, incorporate the following Certifications to those listed under the bolded topic named "Certifications" contained within this report.

➢ The reported analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the requirements of the Code of Professional Ethics

& Standards of Professional Appraisal Practice of the Appraisal Institute, which includes the Uniform Standards of Professional Appraisal Practice.

➢ Use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.



Central Valley Construction Loan Services
7110 North First Street
Fresno, California 93720
Phone (559) 261-0222
Fax (559) 261-1699

July 21, 2008

Mr. Tim Simon
1306 N. Irwin Street
Hanford, CA 93230

Dear Mr. Simon:

Please prepare a Complete Self-contained appraisal report for the property described below. The report should be addressed to Citizens Business Bank.

Owner:                    St. James & Ennis Hanford Investments, LLC

Project Description:   Land is currently in the entitlement process. Please see attached timeline. The EIR has been complete.

Property Address:      SE corner of 12th & Flint Ave. APN 007-360-016 & 007-010-031

Type of Loan:          Land Loan

Borrower Contact:      Sue Lafferty or Brian Ennis (559) 781-8888

The report is to be in accordance with the minimum standards set forth in this letter and "Citizens Business Bank Appraisal Standards". These standards are to be incorporated as part of the scope of the appraisal. You are expected to conform to the current version of the Uniform Standards of Professional Appraisal Practice (USPAP).

You shall sign the appraisal report as the primary appraiser. In addition, all other persons assisting in inspection, the collection of data and/or analysis of the appraisal shall be identified. Any other person signing the report shall be state licensed or certified as appropriate for the property being appraised.

Citizens Business Bank reserves the right to convey a copy of the appraisal to a third party. You may be requested to discuss the analysis in the appraisal report with us.

Page 2

The following are included to assist you in making this report:

| | |
|---|---|
| __X__ | Title Policy |
| __X__ | School Expression of Interest to Purchase Land |
| _____ | Cost Breakdown |
| __X__ | Plans & Specifications |
| __X__ | EIR and Timeline |

The real property interest(s) to be appraised are marked as follows:

__X__  Fee Simple "As Is" Land Value

__X__  Prospective Fee Simple Value "At Completion of Annexation, zoning, tentative map approval"

_____  Prospective Leased Fee Value "At Completion"

_____  Prospective Fee Simple Value "At Stabilized Occupancy"

_____  Prospective Leased Fee Value "At Stabilized Occupancy"

_____  Fee Simple Value "As Is"

_____  Leased Fee Value "As Is"

_____  Other:

The real property interest(s) to be appraised are marked as follows:

__X__  Income Approach Value

__X__  Cost Approach Value

__X__  Sales Approach Value

_____  Insurable Value

If, in your opinion, a value estimate which is not requested above is applicable, it is your responsibility to contact the undersigned before proceeding.

Page 3

Please put copies of the signed Engagement Letter, *Citizens Business Bank Appraisal Standards and the Hazardous Waste Supplements* in the addenda of your report. Send three copies with original signatures and photos to the attention of the undersigned. Please contact the undersigned if you have questions regarding this engagement. In accordance with our oral communication, your appraisal fee for this assignment will not exceed $6,000. The report is to be delivered to the undersigned by September 1, 2008.

*Confidential Information.* "You" acknowledge that all information and documents disclosed by Citizens Business Bank ("Bank") to You, or which comes to your attention during the course of the performance of Services under this Assignment, constitute valuable assets of and are proprietary to the Bank, and also acknowledge that the Bank has a responsibility to its customers and employees to keep the Bank's records and information confidential and proprietary. Therefore, You agree not to disclose, either directly or indirectly, to any person, firm or corporation, information of any kind, nature or description concerning matters affecting or relating to the business of the Bank unless the information is already in the public domain. This provision shall survive termination of this Assignment.

Your acceptance of this assignment is evidenced by your signature below. Thank you for your consideration in performing this assignment.

By: _____

Name:    Debbie Long

Title:    Senior Vice President/Construction Loan          Date of Signature: _____
         Manager

## Acknowledgement

**The undersigned real estate appraiser has read the above appraisal engagement offer from Citizens Business Bank and hereby agrees to accept the offer.**

Executed this _____ day of _____, 200___

Appraisal Firm Name: _____    By: _____

                                                 Title: _____

**Please fax a signed copy of this acceptance to the above at (559) 261-1699.**

## Copyright Protection

© Copyright 2008
Simon Company, Inc.
Hanford, California 93230
All Rights Reserved.

No part of this document may be reproduced, distributed, or disseminated to the public nor may any portion be incorporated into any information retrieval system without written permission from Simon Company, Inc., the copyright holder. Simon Company, Inc. retains exclusive ownership to all information and data contained in this report including yet not limited to all exhibits, photographs, tables, and charts.

All opinions, analyses, and conclusions stated herein are intended for the exclusive use of our client, Citizens Business Bank, and other specifically identified intended users. Only the client and other specifically identified intended users may use this report for the sole purpose and intended use stated herein.

**End of Report**