FILED

February 01, 2010

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002388221

38

1　Law Offices of Peter L. Fear
　　Peter L. Fear, No. 207238
2　Gabriel J. Waddell, No. 256289
　　7750 North Fresno Street, Suite 101
3　Fresno, California 93720
　　(559) 436-6575
4　(559) 436-6580 (fax)
　　pfear@fearlaw.com
5
　　Attorney for ST. JAMES & ENNIS HANFORD INVESTMENTS, LLC,
6　　　Debtor in Possession

7

8　　　　　　　　　UNITED STATES BANKRUPTCY COURT

9　　　　　　EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

10　In re:　　　　　　　　　　　　　　　Case No. 09-17500-A-11

11　ST. JAMES & ENNIS HANFORD　　　　Chapter 11
　　INVESTMENTS, LLC,
12　a California Limited Liability Company,　D.C. No. PLF-4

13
　　　　　　　　　　　　　　　　　　　Date:　N/A
14　　　　　　　　　Debtor.　　　　　Time:　N/A
　　　　　　　　　　　　　　　　　　　Place:　Dept. A, Ctrm. 11, 5th Floor
15　　　　　　　　　　　　　　　　　　　　　　United States Courthouse
　　　　　　　　　　　　　　　　　　　　　　2500 Tulare St., Fresno, California
16　　　　　　　　　　　　　　　　　　　Judge:　Hon. Whitney Rimel

17

18　　**DEBTOR'S AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN OF**
　　　　　　　**REORGANIZATION, DATED FEBRUARY 1, 2010**
19

20

21

22

23

24

# TABLE OF CONTENTS

ARTICLE I.   SUMMARY ........................................................................................ 5

ARTICLE II.   BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11
FILING ........................................................................................................ 7
    2.01   Loan from Citizens Business Bank ................................................ 8
    2.02   Villagio Details. .............................................................................. 8
    2.03   Hanford and Surrounding Area. .................................................... 10
    2.04   Housing Market in Hanford. ......................................................... 12
    2.05   Status of Entitlements. ................................................................... 15

ARTICLE III.   SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE .................. 17
    2.06   Commencement of the Chapter 11 Case. ...................................... 17
    2.07   Retention of Professionals ............................................................ 18
    2.08   Creditors' Committee. ................................................................... 18
    2.09   Events. ............................................................................................ 18
    2.10   Plan and Disclosure Statement ..................................................... 18

ARTICLE IV.   CLASSIFICATION OF CLAIMS AND INTERESTS ............................... 18
    4.01   Class 2.1 – Secured Claim of King County. ................................. 18
    4.02   Class 2.2 – Secured Claim of Citizens Business Bank. ............... 18
    4.03   Class 3 – General Unsecured Claims. ........................................... 19
    4.04   Class 4 – Insider Unsecured Claims. ............................................ 19
    4.05   Class 5 – Equity Interests. ............................................................ 19

ARTICLE V.   TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, U.S.
TRUSTEES FEES, AND PRIORITY TAX CLAIMS ....................................... 19
    5.01   Unclassified Claims. ...................................................................... 19
    5.02   Administrative Expense Claims ..................................................... 19
    5.03   Priority Tax Claims ........................................................................ 19
    5.04   United States Trustee Fees ............................................................. 19
    5.05   Claims for Professional Fees ......................................................... 20
    5.06   Post-Effective Date Professional Fees .......................................... 20

ARTICLE VI.   TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ......... 20
    Claims and interests shall be treated as follows under this Plan: ............... 20
    6.01   Class 2.1 – Secured Claim of Kings County. ............................... 20
    6.01.1   Impairment and Voting. .............................................................. 20
    6.01.2   Treatment. .................................................................................... 21
    6.02   Class 2.2 – Secured Claim of Citizens Business Bank. ............... 21
    6.02.1   Impairment and Voting. .............................................................. 21
    6.02.2   Treatment. .................................................................................... 21
    6.03   Class 3 – General Unsecured Claims. ........................................... 21
    6.03.1   Impairment and Voting. .............................................................. 21
    6.03.2   Treatment. .................................................................................... 21

6.04    Class 4 – Insider Unsecured Claims ............................................... 21
6.04.1   Impairment and Voting. ............................................................. 21
6.04.2    Treatment. ............................................................................. 21
Class 5 – Equity Interests. .................................................................. 21
6.04.2   Impairment and Voting. ............................................................. 22
6.04.3   Treatment. ............................................................................. 22

ARTICLE VII.     IMPLEMENTATION OF THE PLAN .................................. 22
7.01    Overview. ..................................................................................... 22
7.02    Cost and Funding For Entitlements. .............................................. 22
7.03    Entitlement of Property (6 months). .............................................. 23
7.04    Market and Sell "Pods" (12 months). ............................................ 24
7.05    Refinance Loan and Pay CBB (60 to 90 days). .............................. 25
7.06    Management. ................................................................................ 25
7.07    General Authority of Reorganized Debtor as Estate Representative. ........... 25
7.08    Limitation on Liability of Estate Representative. ............................ 26
7.09    Release of Avoidance Actions. ..................................................... 27
7.10    Preservation of Claims and Rights. ............................................... 27
7.11    Operations Pending Effective Date. .............................................. 27

ARTICLE VIII.    FEASIBILITY OF THE PLAN ........................................ 28

ARTICLE IX. ACCEPTANCE OR REJECTION OF THE PLAN ...................... 29
9.01    Impaired Classes to Vote. ............................................................. 29
9.02    Acceptance by Class of Creditors and Holders of Interests. ........... 29
9.03    Cramdown ................................................................................... 30

ARTICLE X.  TAX CONSEQUENCES OF THE PLAN ................................... 30

ARTICLE XI. RISK FACTORS ............................................................... 31

ARTICLE XII.     LIQUIDATION ANALYSIS ........................................... 31

ARTICLE XIII.    ALLOWANCE AND DISALLOWANCE OF CLAIMS ............ 32
13.01   Disputed Claim. ........................................................................... 32
13.02   Filing of Objections to Claims. ..................................................... 32
13.03   Delay of Distribution on a Disputed Claim. .................................. 33
13.04   Settlement of Disputed Claims. .................................................... 33

ARTICLE XIV.    PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED
LEASES 33
14.01   Assumed Executory Contracts and Unexpired Leases. ................... 33
14.02   Rejected Executory Contracts and Unexpired Leases. .................... 33

ARTICLE XV.     EFFECT OF CONFIRMATION ...................................... 34
15.01   Revesting of Assets ..................................................................... 34
15.02   Discharge. ................................................................................... 34
15.03   Judgments Void .......................................................................... 34

| | | | |
|---|---|---|---|
| **ARTICLE XVI.** | | **GENERAL PROVISIONS** | 35 |
| | 16.01 | Definitions and Rules of Construction | 35 |
| | 16.02 | Effective Date of Plan | 35 |
| | 16.03 | Severability. | 35 |
| | 16.04 | Binding Effect. | 35 |
| | 16.05 | Captions. | 35 |
| | 16.06 | Retention of Jurisdiction | 35 |
| | 16.07 | Post-Effective Date of Distributions | 36 |
| | 16.08 | Fractional Amounts | 36 |
| | 16.09 | Ex Parte Relief | 36 |
| | 16.10 | Governing Law | 36 |
| | 16.11 | Modification of Payment Terms | 36 |
| | 16.12 | Setoff | 37 |
| | 16.13 | United States Trustee Fees | 37 |
| | 16.14 | Post-Confirmation Reports | 37 |
| | 16.15 | Final Decree | 37 |
| **ARTICLE XVII.** | | **AMENDMENT OR WITHDRAWAL OF THE PLAN** | 38 |
| | 17.01 | Amendment of the Plan | 38 |
| | 17.02 | Revocation or Withdrawal of the Plan | 38 |

# ARTICLE I.

## SUMMARY

This document contains a Plan of Reorganization (the "Plan") proposed by Debtor and Debtor in Possession St. James & Ennis Hanford Investments, LLC ("Debtor") under chapter 11 of the Bankruptcy Code (the "Code") and a Disclosure Statement. The Plan proposes that Debtor obtain a tentative and final map to develop the property and then sell off phases of the development to pay creditors.

This Plan provides for two classes of secured claims, two classes of unsecured claims; and one class of equity security holders. This Plan also provides for the payment of administrative claims in full on the Effective Date.

All holders of Claims against, and Equity Interests in, the Debtor are encouraged to read this Plan and Disclosure Statement and the related solicitation materials in their entirety before voting to accept or reject the Plan. An acceptance or rejection of the Plan must be in writing and may only be made by completing the ballot that accompanies this Plan and Disclosure Statement, including signature. In order for your vote to be counted, it must be received by mail, personal delivery, fax or e-mail no later than 4:00 p.m. (Prevailing Pacific time) by the date and time set by the Court at the following address:

> Law Offices of Peter L. Fear
> Attention: Peter L. Fear
> 7750 N. Fresno Street, Suite 101
> Fresno, CA 93720
> Facsimile: 559.436.6575
> E-mail: pfear@fearlaw.com

IT IS IMPORTANT THAT YOU EXERCISE YOUR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN. You have been sent a ballot and instructions for voting, if eligible, with this Plan and Disclosure Statement. You should read the ballot carefully and follow the instructions contained therein.

This Plan and Disclosure Statement includes (among other things) a brief history of the Debtor, a summary of its Chapter 11 Case, a description of the Claims against and Equity Interests in the Debtor, a summary of the Plan, a discussion of the Plan's feasibility and a liquidation analysis setting forth what holders of a Claim against or Equity Interest in the Debtor would recover if the Debtor was liquidated immediately under Chapter 7 of the Bankruptcy Code.

UPON BANKRUPTCY COURT APPROVAL OF THE PLAN, THE PLAN WILL BE BINDING UPON ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS. THEREFORE, IT IS IMPORTANT THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS READ AND CAREFULLY CONSIDER THE PLAN AND DISCLOSURE STATEMENT.

The Debtor requests that you vote promptly for the Plan upon carefully reviewing the accompanying materials. If you have any questions concerning the procedures for voting or any questions concerning your treatment under the Plan contact the attorney whose name and contact information are on the face page of this Plan.

THE FINANCIAL PROJECTIONS CONTAINED IN THIS PLAN AND DISCLOSURE STATEMENT REPRESENT THE DEBTOR'S ESTIMATES OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS MORE FULLY DESCRIBED BELOW, SOME OR ALL OF WHICH MAY NOT BE REALIZED.

THE CONTENTS OF THIS PLAN AND DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. YOU SHOULD CONSULT WITH YOUR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING YOUR CLAIM OR INTEREST.

THIS PLAN AND DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND OTHER PARTIES IN INTEREST AND FOR THE SOLE

PURPOSE OF ASSISTING THEM IN MAKING AN INFORMED DECISION ABOUT THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS IN CONJUNCTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS PLAN AND DISCLOSURE STATEMENT OR IN THE BALLOTS. IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY DEBTOR.

THIS PLAN AND DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION TO PERMIT A CREDITOR TO VOTE ON THE PLAN. THE COURT'S APPROVAL OF THIS PLAN AND DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE AN ENDORSEMENT OF THIS PLAN AND DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

## ARTICLE II.

### BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING

This Chapter 11 proceeding was commenced by the filing of a voluntary petition on August 5, 2009. Before the filing of this bankruptcy case, Debtor was preparing a large parcel of land for development that would be known as "Villagio." The bankruptcy case was filed to stop an imminent foreclosure sale. St. James Construction, Inc. and Ennis Family Investments, LLC each own a 50 percent interest in Debtor.

2.01    **Loan from Citizens Business Bank**

The original land acquisition loan was made to Debtor by Citizens Business Bank (CBB) effective November 4, 2005, in the amount of $18,000,000 (the "Loan"). At the time of acquisition, the land was appraised for $42,000,000 by Keith Hopper (MAI).

Over $7 Million in cash has been invested in the project by the members of Debtor. The Loan was extended by CBB effective October 26, 2007 for a period of one year. In October 26, 2008 CBB extended the Loan to February 5, 2009. CBB holds a pledged deposit of $281,472.28 which was supposed to be used for the monthly payment of interest on the Loan. These funds were available to pay the outstanding interest but have not been applied to interest by CBB. Had CBB applied those funds towards the payment of interest without the application of either a penalty interest rate or legal fees, the pledged amount would pay interest due through May 2009.

At this time, CBB has refused to extend the Loan and the Loan is in default.

2.02    **Villagio Details.**

Villagio is a 302+/- acre proposed master planned community in Hanford, California. Villagio is located in the most affluent area of Hanford, lies within the most desirable school district, and is well supported with public facilities and shopping. A full brochure and proposal has been included herewith as Exhibit "B."

The Villagio land plan provides for:

- 1,065 single family detached units and 363 multi-family units; a combined total of 1,428 units;
- A "Main Street" Village Core including a central gathering plaza with 135,000 square feet of commercial space;
- A 13.171 acre school site which has been approved by the appropriate school district and state authorities;

- A 7.575 acre church site;

- Two large community parks with various recreational and life style amenities;

- Several pocket parks throughout the project with BBQ areas, shade trees, flower gardens and gathering areas which will service as a focal point for the local neighborhoods within Villagio;

- Several miles of meandering biking and walking trails which will connect the neighborhoods and commercial districts of Villagio as well as provide extensive landscaping.

The largest portion of the site, approximately 205.3 acres or 68 percent of the land area, is devoted to residential uses. Villagio offers a wide variety of home styles:

- At the upper end of the price range are 57 custom home lots between 9,600 and 12,500 square feet located in a gated community at the center of the project.

- The largest portion of the property is devoted to the median price range for single family detached product. The plan provides for 705 units of median priced housing using 135.5 acres of the project. These lots range in size from 3,875 to 7,700 square feet, and are separated into a number of different subdivisions to offer a variety of house plans and designs.

- The medium density residential portions cover approximately 29.3 acres and supplies an additional 303 units. This product type includes detached cluster homes as well as micro-lot urban houses.

- High density residential comprises approximately 20.4 acres with 363 units. The project is designed to have 24 phases in addition to the school, church, and commercial sites. A Phasing Plan is included in the brochure. (Two phases have been inadvertently numbered as "18." For future reference, the single

family phase towards the North will be 18-A, the multi-family phase near the commercial site will be 18-B).

2.03    **Hanford and Surrounding Area.**

The City of Hanford is one of four incorporated cities located within Kings County and is located within the southern Central Valley region of California. Kings County and Hanford are central to all of California. Hanford is approximately 200 miles north of Los Angeles and 210 miles south of San Francisco. Hanford has become a bedroom community for commuters as well as attracting retirees from major metropolitan areas. It is also just 32 miles south of Fresno, one of the larges metropolitan areas in the Central Valley and the State's fourth largest city. The January 2008 population estimate for Kings County was 154,434, which represented a 1.9 percent increase over the previous year. This rate was higher than the State's average of 1.3 percent. Kings County's 5-year growth rate, as of 2008, was 9.2 percent as opposed to 5.3 percent for the State of California. The growth in per-capita income in the Hanford-Corcoran Metropolitan Area, cited as 4.3 per cent over the same period in 2008 (one year) which itself was a 3.9 percent increase over the previous year, 2007.

The economy of Kings County is based on three major pillars: agriculture, manufacturing, and government. About 84 percent of the land area in the county is used for agriculture, the former principal employer of the area and primary economic industry. The Lemoore Naval Air Station (LNAS) is located on the western portion of Kings County. LNAS is the home for the F/A-18E/F Super Hornet, the Navy's newest and most advanced aircraft. It should be noted that LNAS is one of the top two contenders being considered to become the West Coast home of the Navy's F-35 Joint Strike Fighters, the next generation of aircraft which is scheduled to replace the Hornets. LNAS survived BRAC 2005 and will grow by 2 squadrons in the near future due to closures of other facilities. Each squadron includes approximately 1,200 active duty personnel plus their families.

In addition to LNAS, government employees who live in Hanford work in State prisons in Avenal, Corcoran, Delano, Coalinga, Coalinga State Hospital and Pleasant Valley State Prison. Not all are located within Kings County but all are within commuting distance. Pleasant Valley opened in 2005 and is a 1.2 million square foot mental health and treatment hospital with a total of 1,500 beds. The facility was scheduled for further expansion in 2006 and slated to add over 2,000 jobs. West Hill Community College and College of the Sequoias both serve Kings County and have built facilities within the last 5 years.

The City of Hanford is the county seat and is located in the northeastern portion of the County. The city is generally bounded by State Route 43 to the east, Flint Avenue to the North, 13th Avenue to the West and Houston Avenue to the South. The 5-year annual growth rate for Hanford is 13.4 percent. In addition to housing local government and business employees, Hanford has become home to those commuting to neighboring cities such as Fresno and Visalia. Additionally, it was recently announced that a proposed stop for the California High Speed Rail will be located in Hanford, affording residents the ability to reasonably commute as far as the Bay Area, Sacramento, and Los Angeles metro areas. Currently under construction in Hanford are a general hospital, a community college campus, and a new high school all scheduled to complete in 2010. The City provides public water and sewer, and a master plan has been adopted for storm drainage. The Southern California Gas Company provides natural gas while Southern California Edison Company supplies electricity and Pacific Bell provides telephone service to the City.

A principle reason for Hanford's growth is the low cost of living, quality of life and availability of services and shopping. Hanford has a mall with major retailers such as JC Penney, Sears and Ross. Other major retailers include a Super Wal-Mart, Target, Lowe's, Home Depot, Michael's, Famous Footwear, Old Navy, Forever 21, and others. A new auto mall was recently completed on 37 acres at the corner of 12th Avenue and State Highway 198

where a Toyota and Hyundai dealership have opened. All these retailers are located within 3 miles of the Villagio project.

2.04 **Housing Market in Hanford.**

There are 4 fully developed projects on the north-west side of Hanford that would be in direct competition with the median and lower priced units planned for Villagio. The only projects currently under construction and selling are both owned by McMillin Homes; the Bordeaux and Meridian products. These are located directly south of Villagio. Prices begin at $210,000 for a 1357 square foot home for the Meridian product and $270,000 for a 2118 square foot home for a Bordeaux product. Between the two lines, McMillin appears to be averaging approximately 10 units per month.

The other two subdivisions are owned by Centex and Ennis Homes. Both Centex and Ennis Homes appear to have temporarily halted progress on those projects. Centex's Copper Valley is a small lot product (lots are equivalent in size to the 45' X 65' product in Villagio which incidentally exist along 12th Avenues shown as phases 7 and 11) directly south-west of Villagio. Homes in Copper Valley start at $203,000 for a 1,168 square foot home, and are not being offered at this time. Ennis Homes has a development directly southeast of Villagio. Ennis' development, Arbor Park, is advertising a 1,000 square foot home on a 6,000 square foot lot, starting at $180,000. It should be noted that only the Centex development is in the Pioneer School District.

There are approximately 40 available finished lots remaining in Arbor Park (the Ennis Homes project) and about 80 available finished lots remaining in Copper Valley (the Centex project). There are about 60 unfinished lots (no street or utilities installed) and approximately 25 available finished lots remaining. There are approximately 260 lots one mile south of Villagio (tentative subdivision map 843) with an asking price of $57,500 to $60,000 per paper lot. These lots average around 7,500 square feet. Although the lots are unfinished with no curb,

gutter or road base, it appears the utilities have been stubbed to almost a third of the units. These lots are not in the Pioneer School District. It has been reported that several offers ranging around $45,000 per tentative mapped lot have been made in the past to the owner, and were all rejected. It appears as of September 15, 2009, Lennar has begun to finish development on that project, currently installing curb and gutter. Parties related to the development have stated Lennar will purchase the property in at least four phases. The first phase will close at approximately $50,000 per tentative mapped lot, plus the expence of improvements required to complete the lots. Subsequent phases will increase in price. It is believed escrow will close on the first phase some time in the first quarter 2010. In addition there are approximately 235 unimproved lots directly west of Copper Valley which are currently in agricultural production. The asking price is slightly above $52,500 per paper lot and the average square footage is approximately 7,500.

The final property with unimproved lots is directly east of Villagio, running along the BNSF rail road tracks. There are 144 mapped lots in that project which average above 8,500 square feet. Those lots closed escrow around August for about $5,000 per lot in a very quick sale. Prior to that, the last known bulk paper lot sale in Kings County occurred in the fourth quarter of 2008 in Armona, a very small community west of Hanford along Highway 198. There were two sales in the same Armona subdivision for a combined total of about 100 unimproved lots. These lots averaged about 5,500 square feet and sold for about $22,500 per unimproved lot. Because of the quality of schools, the nature of the neighborhoods, and other available services, property in north-west Hanford historically sells at a 35 to 45 per cent premium over property located in Armona, depending on the size and exact location of the property.

There are two large apartment complexes in the Pioneer School District that are not age or income restricted. Those properties are River Oaks and Edgewater Isle, and they are

approximately 1.5 miles south-east of Villagio. River Oaks has apartments ranging in size from 1 bed room 1 bath units to 3 bed room 2 bath units with rents ranging from $655 to $1,017 per month. There are a total of 219 units in the River Oaks project. As of April 16, 2009, River Oaks had 1 vacant apartment, a 2 bedroom 1 bath unit, and experienced an occupancy rate of slightly over 98 per cent. River Oaks has a 7 month waiting list for 3 bedroom 2 bath units. Edgewater Isle has a total of 370 units ranging in size from a 1 bedroom 1 bath unit to 3 bedroom 2 bath units. Rents at Edgewater Isle range from $775 to $1125 per month. As of April 16, 2009, Edgewater had 8 vacant units, 3 – 1 bedroom 1 bath units, 4 – 2 bedroom 1 bath unit, and 1 – 2 bedroom 2 bath unit. Edgewater's occupancy rate is 95 percent. Over the past several years, it has not been uncommon for both complexes to have a span of 3 or more months during which both are completely full with a multiple month waiting list for all 1 and 3 bedroom units. Because 2 bedroom units represent a large percentage of the total unit mix, it is less common for them to maintain a waiting list, although this has occurred recently. As the data indicates there is sufficient need for more rental apartments.

Kings County Multiple Listing Service (MLS) records show that on August 12, 2009, about 35 percent of homes in Kings County listed on MLS were either bank owned or required a "short sale" (a sale where the total sale price is less than the total amount owed to lenders). As of August 12, 2009, there were 104 homes listed for sale on the MLS in Hanford, a 52.5 percent decrease from one year ago, with an average listed price of $224,368. The total number of homes listed on the MLS for Kings County is 161, a 50.3 per cent decrease from about one year ago when 324 homes were listed. The average listing price in Hanford was $202,275 at the beginning of January 2009. The current average listing price in Hanford is $224,368, this represents an increase of $22,093 or 10.9 per cent since the beginning of 2009.

As a general rule, new homes are not listed on the MLS. To understand whether the market will continue recovery or be derailed by excessive inventory, one must analyze the

building permit data. Historically, Hanford builders have pulled approximately 300 permits per year for single family residence since 1999. Assuming Hanford's new single family housing demand remained at this level since 1999, Hanford is currently experiencing a net deficit of approximately 185 new single family homes as of September 2009.

A market study done by The Sullivan Group on behalf of E-C Entitlements in 2006, projected Villagio would capture the equivalent of 40 per cent of the new single family housing market in Hanford. Assuming Hanford recaptures the 185 new single family home deficit over the next five years, approximately 340 units per year must be built to meet the projected demand. If the Villagio project does capture 40 percent of the new single family permits pulled in Hanford, it should take approximately 8 years from its initial offering to build out.

The supply of existing homes has decreased substantially, and prices have begun to increase, thus showing demand has finally outpaced supply. Prices have, therefore, stabilized. In accordance with the information shown above, it appears the bottom of the housing market is past. The Villagio project is not only viable but a necessary part of the future growth of Hanford.

Presently, we are in the third straight month of growth in the national housing market. According to the AP, the national, residential, new construction market grew by 23% due to buyers taking advantage of tax credits, low prices, and historically low interest rates. This shows that the market is beginning to revive and adds to the feasibility of Villagio.

2.05    **Status of Entitlements.**

Villagio is the largest single site remaining in the northwestern quadrant of the 2010 General Plan adopted by the City of Hanford. The entire project falls within the Pioneer Elementary School District, and the Hanford Joint Union High School District.

- The City of Hanford certified the Environmental Impact Report on December 15, 2008

- The City of Hanford approved a general plan amendment and approved the pre-zoning of the Property on January 20, 2009 subject to annexation to the City. Zoning of the subject property will be official upon finalization of annexation.

- The City of Hanford approved the Planned Unit Development application on January 20, 2009.

- LAFCO approved Villagio for annexation to the City of Hanford on March 25, 2009 and the U.S. Department of Justice has reviewed the annexation application and issued a pre-approval notice.

- Annexation is expected to be complete by March 30, 2010.

- The tentative map creating separate parcels for each of the 27 Pods or Phases will be filed within 6 months. In order to be able to record the final map creating these parcels, the following steps will need to be done:

  - Create homeowner's associations to address common areas in each phase and throughout the project;

  - Prepare landscaping plans and a landscape and lighting maintenance district to take care of the costs for landscaping and lighting;

  - Prepare a master grading plan for the entire project;

  - Prepare a master infrastructure plan for water, sewer and other utilities;

  - Prepare a development matrix which will allocate responsibility for various obligations between the different Parcels; and

  - Provide for payment of property taxes due to date.

Because utilities exist at the south-east corner of the Villagio project (the intersection of 12th & Fargo Avenues), development should begin there and move north. Before annexation,

the entire site was within the Williamson Act. The Williamson Act of the state of California (officially, the California Land Conservation Act of 1965) is a California law that provides relief of property tax to owners of farmland and open-space land in exchange for a ten-year agreement that the land will not be developed or otherwise converted to another use. However, a provision in that act allows for the development of public facilities. Further, in the event that a protest was made by a municipal corporation prior to the property entering into the Williamson Act, that protest removes the ten-year contract requirement upon annexation, where the existing city limits were within one mile at the time of the protest. Prior to the property entering the Williamson Act, the City of Hanford properly recorded a protest. At annexation, all but approximately 100 acres will be removed from any requirements forced by that Act. A notice of non-renewal was filed in 2006 for the remaining acreage. There are two items of note on this issue. First, in order to annex land into the City that has not been properly protested, the City must agree to succeed administration of the contract for any remaining time. The City of Hanford has agreed to do so for the portion of the property remaining in the Williamson Act. The amount of time that property is remaining in the Williamson Act is approximately seven years. Secondly, the area remaining within the Williamson Act contract is on the farthest northern boundary of the development. By conservative estimates, it will be 6 years before development reaches that portion of the site.

## ARTICLE III.

## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

2.06 **Commencement of the Chapter 11 Case.** On August 5, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Chapter 11 Case was assigned to the Honorable Whitney Rimel, United States Bankruptcy Judge for the Eastern District of California (Fresno Division).

2.07 **Retention of Professionals**. On September 12, 2009, the Bankruptcy Court entered an order approving the Debtor's retention of the Law Offices of Peter L. Fear to serve as the Debtor's reorganization counsel.

2.08 **Creditors' Committee**. No creditors' committee has been appointed in this case. There is only one non-insider unsecured creditor.

2.09 **Events.** Debtor filed a motion for authorization to use cash collateral to complete entitlements for the real property. That motion was set for hearing on September 30, 2009 and the final hearing was held on October 28, 2009. The Court authorized use of cash collateral to complete the annexation and denied the remainder of the motion without prejudice.

2.10 **Plan and Disclosure Statement**. The Bankruptcy Court has provisionally approved the Disclosure Statement aspects of the Combined Plan and Disclosure Statement and set balloting dates and the date of the commencement of the Confirmation Hearing provided on the notice and order which accompanies the Plan.

## ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS

4.01 Class 2.1 – Secured Claim of King County. Class 2.1 consists of the claim of Kings County for property taxes on Debtor's real property. Debtor believes the amount of the claim is approximately $212,000.

4.02 Class 2.2 – Secured Claim of Citizens Business Bank. Class 2.2 consists of the claim of Citizens Business Bank which is secured by Debtor's real property. Debtor believes the amount owing on this claim is approximately $19 million.

4.03    <u>Class 3 – General Unsecured Claims.</u> Class 3 consists of noninsider general unsecured claims allowed under § 502 of the Code. Debtor estimates the total amount of unsecured claims to be $47,108.39.

4.04    <u>Class 4 – Insider Unsecured Claims.</u> Class 4 consists of insider general unsecured claims allowed under § 502 of the Code. Debtor estimates the total amount of unsecured claims to be approximately $2.5 million.

4.05    <u>Class 5 – Equity Interests.</u> Class 5 consists of equity interests in the Debtor.

## ARTICLE V.

### TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,

### <u>U.S. TRUSTEES FEES, AND PRIORITY TAX CLAIMS</u>

5.01    **Unclassified Claims.** Pursuant to section §1123(a)(1), administrative expense claims, and priority tax claims are not in classes.

5.02    **Administrative Expense Claims**. Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the effective date of this Plan (as defined herein), in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. Except as set forth in Section 5.05 and Section 5.06 of this Plan and Disclosure Statement, all requests for payment of Administrative Claims must be filed by 30 days after Confirmation or the holders thereof shall be forever barred from asserting such Administrative claims against the Debtor or the Reorganized Debtor.

5.03    **Priority Tax Claims**. Debtor does not believe there are any priority tax claims.

5.04    **United States Trustee Fees**. All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed,

dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the effective date of this Plan will be paid on the effective date.

5.05 **Claims for Professional Fees**. Each Person seeking an award of Professional Fees: (a) must file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days of the Effective Date; and (b) if the Bankruptcy court grants such an award, must be paid in full in Cash in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the requirements of the Bankruptcy Code, the Bankruptcy Rules and any applicable guidelines and with all of the terms and conditions set forth in any applicable order of the Bankruptcy Court, including, without limitation, the Confirmation Order, and all other orders governing payment of Professional Fees.

5.06 **Post-Effective Date Professional Fees**. All Professional Fees for services rendered in connection with the Chapter 11 Case and the Plan after the Effective Date are to be paid by the Reorganized Debtor upon receipt of an invoice for such services, or on such other terms to which the reorganized Debtor and the relevant Professional may agree, without further Bankruptcy Court authorization.

## ARTICLE VI.
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

Claims and interests shall be treated as follows under this Plan:

6.01 **Class 2.1 – Secured Claim of Kings County.**

6.01.1 **Impairment and Voting.** Class 2.1 consists of the secured claim of Kings County, and is impaired under the Plan; consequently, the holder is entitled to vote on the Plan.

6.01.2　**Treatment.** As described in Article VII, the Class 2.1 creditor will be paid in full as part of the entitlement process.

**6.02**　**Class 2.2 – Secured Claim of Citizens Business Bank.**

6.02.1　**Impairment and Voting.** Class 2.2 consists of the secured claim of Citizens Business Bank, and is impaired under the Plan; consequently, the holder is entitled to vote on the Plan.

6.02.2　**Treatment.** As described in Article VII, the Class 2.2 creditor will be paid all net proceeds from sales of phases and finally from the proceeds of refinancing described in Article VII.

**6.03**　**Class 3 – General Unsecured Claims**

6.03.1　**Impairment and Voting.** Class 3 consists of allowed noninsider unsecured claims, and is impaired under the Plan; consequently, the holders are entitled to vote on the Plan. Debtor estimates the total amount of Class 3 claims is $47,108.39.

6.03.2　**Treatment.** Holders of Class 3 claims shall be paid in full without interest from the proceeds of the refinancing described in Article VII, approximately 18 months after the Effective Date.

**6.04**　**Class 4 – Insider Unsecured Claims**

6.04.1　**Impairment and Voting.** Class 4 consists of insider unsecured claims and is presumed to have rejected the Plan.

**6.04.2**　**Treatment.** Class 4 claims are subordinated to other unsecured claims and will receive no payments under the plan. In exchange for permitting the SJEHI to use the funds in the bank controlled account and any agricultural proceeds for this purpose, the Ennis members have agreed to forgive all loan amounts to the entity, totaling $2,220,444.24 excluding interest.

**Class 5 – Equity Interests**

6.04.2 **Impairment and Voting.** Class 5 consists of equity interests, and is impaired under the Plan; consequently, the holders are entitled to vote on the Plan.

6.04.3 **Treatment.** Each holder of an Equity Interest will retain such Equity Interest notwithstanding the Confirmation of this Plan.

## ARTICLE VII.

## IMPLEMENTATION OF THE PLAN

7.01 **Overview.** Debtor shall use available cash to get the property entitled, sell off certain subdivided phases of the property, apply the proceeds of those sale to the amount owed to Citizens Business Bank and refinance the balance owed.

7.02 **Cost and Funding For Entitlements.** Following is a summary of the costs to obtain entitlement of the property and Debtor's proposed funding sources:

- The estimated cost for engineering, architecture, attorneys and city fees to complete entitlement of the property is $160,000. These costs are allocated as follows and on the timeline included herewith as Exhibit "C":

|      |                          |          |
|------|--------------------------|----------|
| i.   | Annexation               | $6,000   |
| ii.  | Vesting TSM              | $20,000  |
| iii. | Home Owners Assoc.       | $10,000  |
| iv.  | Landscape & Lighting Dist. | $9,000  |
| v.   | Grading Master Plan      | $41,000  |
| vi.  | Water/SS/SD Master Plan  | $38,000  |
| vii. | Development Matrix       | $11,000  |
| viii.| Development Agreement    | $10,000  |
| ix.  | City Fees                | $15,000  |

- In order to be granted the right to subdivide the property, taxes on a given parcel must be current with a bond posted on the next year's amount due (FY 2010-11). (Payment of taxes on the Northern parcel may be able to be postponed.) The cost to do this is estimated at $275,250.

- This brings the total additional cost (covering engineering, architecture, attorneys and taxes) to develop the entire 302.4 acres and subdivide the southern parcel to approximately $435,250.

- As of October 31, 2009, St. James & Ennis Hanford Investments LLC, had approximately $112,000 in its Debtor in Possession bank account. In addition, approximately $281,400 is being held in a bank account at Citizens Business Bank.

- Within the next 180 days, it is anticipated that an additional $23,925 will be paid by Faith Farms, Inc for the rental of the open ground, assuming there is sufficient water to farm that land. In addition, a deposit for walnuts to be harvested will be received. That amount is estimated to be $35,000.

- Within the next 180 days, the anticipated total liquid assets of the partnership will be $452,325.

- If these funds are used toward the development of the project there will be $17,075 remaining in cash for overages.

**7.03** **Entitlement of Property (6 months).** Debtor will prepare and record subdivision map creating 27 "Pods" or "Phases" as shown on Exhibit "B." The preparation of a tentative map in what we have chosen to characterize as a "pod" format involves a map for each separate phase shown on the land plan, i.e., 27 phases (including the Commercial, School and Church Sites) without establishing individual lot lines for each single family dwelling. Each individual phase could be sold independently once the final map is recorded. Debtor

anticipates this phase will take approximately six (6) months and that Debtor will begin work on the entitlements after obtaining court authorization to use cash collateral. In order to record the vesting tentative map, the following payments must be made:

- Property taxes to the County of Kings which are past due from Fiscal Year 2008-09 on both parcels. Assuming payment on November 10, 2009, the total amount due is $194,473.04. On the southerly parcel (007-360-016), the amount due will be $94,921.63 on that date, and on the northerly parcel (007-010-031), the amount will be $99,551.41.

- Property taxes due the County of Kings effective December 10, 2009, total $82,733.22 (in addition to the past due amounts noted above). The southerly parcel (007-360-016) will have $40,381.55 due, and the northerly parcel (007-010-031) will have $42,351.67 due assuming the same amounts paid last year remain unchanged.

- The estimated cost for engineering, architecture, attorneys and city fees to get the property entitled is $160,000.

- Total Estimated Cost to Process and Record Tentative Map: $435,250.

    7.04    **Market and Sell "Pods" (12 months).** The newly created Pods with zoning and a certified Environmental Impact Report (EIR) which allows for development will increase significantly in value. An appraisal performed for CBB by Simon Company, Inc., dated August 29, 2008, stated that upon annexation, zoning and the issuance of a tentative map the land value would be $27,000,000, as opposed to $22,650,000 without those items. After recordation of the Tentative Map, Debtor plans to sell parcels in order to raise funds to retire the CBB debt using the following process:

- Debtor proposes to engage a third party qualified real estate broker for the sale of the all or a portion of the Villagio project

- The values of a few of the various phases within the southern parcel and closest to existing development are estimated as follows (the values listed are based upon a sale of the parcels in "pod" form):
    - The Commercial Phase (+/- 12 acres; $500,000 per acre)  $6,000,000
    - Phase 1 (71 Single Family Lots; $5,634 per lot)  $400,000
    - Phase 2 (48 Single Family Lots; $7,500 per lot)  $360,000
    - Phase 3 (64 Single Family Lots; $7,500 per lot)  $480,000
    - Phases 22 & 23 (112 Multi-Family Units)  $672,000
    - Phase 5 (63 Single Family Units; $5,000 per lot)  $315,000
    - Phase 4 (73 Single Family Lots; $7,000 per lot)  $511,000
- The gross estimated total cash received from these sales total will total $8,738,000. These monies, net of costs and expenses of sale, will be paid to Citizen's Business Bank on account of the Loan.
- Debtor anticipates it will take approximately 12 months to consummate the sales described above.

7.05 **Refinance Loan and Pay CBB (60 to 90 days).** After the sale of the Phases described hereinabove, the Debtor will re-finance the balance of the Loan with CBB, or another acceptable lender. Debtor anticipates this will take approximate 60 to 90 days after the sales described above.

7.06 **Management.** On the Effective Date, the currently existing management shall continue to manage the Reorganized Debtor. Such Manager may be replaced after the Effective Date as permitted under applicable non-bankruptcy law without further order of the Bankruptcy Court.

7.07 **General Authority of Reorganized Debtor as Estate Representative.** On and after the Effective Date, without need for further action by the Debtor or the Reorganized

Debtor, and without further order of the Bankruptcy Court, the Reorganized Debtor shall be appointed Estate Representative under Section 1123 of the Bankruptcy Code and, by and through its management, shall be solely responsible for and shall have authority to: (a) make all Distributions required to be made on or after the Effective Date to holders of Allowed Claims; (b) settle, resolve and object to Claims; (c) pay all fees payable under 28 U.S.C. § 1930; (d) file any post-Confirmation reports required by the Bankruptcy Code or the Bankruptcy Court; (e) retain, employ and utilize such Professionals as may be necessary without further approval of the Bankruptcy Court; (f) abandon property of the Estate that is determined by the Reorganized Debtor to be burdensome or of inconsequential value; (g) do all things necessary and appropriate to fulfill the duties and obligations of the Debtor and the Reorganized Debtor under the Plan, the Confirmation Order, the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, entering into and performing under the Governance Agreement and any other Plan Documents; and (h) move for the entry of a Final Decree and prepare and file any pleadings as may be required by the Bankruptcy Court in connection with the Final Decree and the closing of the Chapter 11 Case. In addition, the Reorganized Debtor shall be substituted as successor to the Debtor and its Estate in all actions and proceeding spending or thereafter commenced in the Bankruptcy Court with respect to Disputed Claims.

**7.08** **Limitation on Liability of Estate Representative.** The Reorganized Debtor shall not be liable for any act or omission committed in its capacity as Estate Representative under the Plan while acting in good faith and in the exercise of reasonable business judgment, except to the extent determined to be the result of its own gross negligence, willful fraud or other willful misconduct. The foregoing limitation on liability will apply equally to the agents, employees or Professionals of the Reorganized Debtor acting on behalf of the Debtor and its Estate in the fulfillment of their duties under the Plan.

**7.09** **Release of Avoidance Actions.** On the Effective Date, all Avoidance Actions shall be released, waived and abandoned by the Debtor and its Estate.

**7.10** **Preservation of Claims and Rights.** Except as expressly set forth herein, nothing in the Plan shall be deemed to constitute a waiver of the powers of the Debtor as a debtor in possession under the Bankruptcy Code, the Bankruptcy rules or the Local Rules and the Debtor and the Reorganized Debtor as applicable shall retain after the Confirmation Date and after the Effective Date all powers granted by the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, including, without limitation, recovery of property and objections to, and/or subordination of Claims. Confirmation of the Plan effects no settlement, compromise, waiver or release of any Claim, cause of action or claim for relief held by the Debtor or Reorganized Debtor unless the Plan or Confirmation Order specifically and unambiguously so provides. The Debtor intends that the nondisclosure or nondiscussion of any particular Claim, cause of action or claim for relief held by the Debtor shall not be construed as a settlement, compromise, waiver or release of any such Claim, cause of action or claim for relief held by the Debtor. Except as otherwise provided in the Plan or the Confirmation Order, the Debtor and the Reorganized Debtor reserve any and all of their Claims and rights against any and all third parties, whether such Claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date and/or the Distribution Date. The entry of the Confirmation Order shall not constitute res judicata or otherwise bar, estop or inhibit any actions by the Debtor or the Reorganized Debtor upon any Claims it holds as identified herein or otherwise.

**7.11** **Operations Pending Effective Date.** Until the effective Date, the Debtor will continue to operate its business, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VIII.

## FEASIBILITY OF THE PLAN

The most recent appraisal available to the Debtor performed for CBB by Simon Company, Inc., dated August 29, 2008, stated that upon annexation, zoning and the issuance of a tentative map the land value would be over $27,000,000. As agricultural land, the subject property is worth approximately $10,000,000. The increase in value is generated by several means. The first is by dividing up the property into smaller more manageable and marketable portions. This decreases the length of time involved between an investor purchasing the property and selling to the consumer. Also, the cost to purchase many of the phases is less than $10,000,000, consequently increasing the number of capable potential buyers. Further, large, publicly owned and traded builders are prohibited from purchasing unentitled land. Completion of entitlement allows them to compete as potential buyers. As more buyers become interested in the property, demand increases. As demand increases the value will increase. The second is that entitlement and annexation of the property removes risk by decreasing the unknown risk involved with developing each portion of the property. As the property progresses to a finished map stage, there are fewer opportunities for local opposition to arise or particularly, for the City of Hanford to increase demands in exchange for the right to develop the project. It is very likely the City may increase demands if a new developer were to take over development of the project at this point. This increases risk and decreases value.

As to the assertion by CBB that completing the tentative map will decrease value, every appraisal completed on behalf of CBB has stated the tentative and subsequent final map suggested by the Debtor would be the highest and best use for the property and increase its value. This means, if the property is foreclosed upon prior to completion of the proposed tentative map, any developer who may purchase the property would more than likely pursue plans as created by the Debtor.

Finally, CBB has stated it loaned the money solely to purchase the property not to develop it. CBB on several occasions acknowledged that the Debtor was using the loan term to receive approval of a tentative map, and has been consulted several times over the loan term on the progress and layout of Villagio. Furthermore, CBB asked the Debtor on many occasions to consider CBB for its construction lender after the receipt of the tentative map.

The property taxes must be paid whether the land is developed or not. Therefore, the actual cost to develop the property is $160,000. By allowing Debtor to finish developing the Villagio project the value of the property increases by over $17,000,000. Completion of the development in accordance with the proposed master plan is to the bank's benefit. This will maximize the pay down of debt to CBB and allow the debtor to pay all other debts as well as create residual value.

For these reasons, Debtor believes that the Plan is feasible and that it will provide more for CBB than if CBB sold the property at a foreclosure sale or without entitlements being obtained.

CBB disagrees with many of the forward-looking statements in this disclosure statement and has stated its intent to oppose confirmation of the Plan.

## ARTICLE IX.

### ACCEPTANCE OR REJECTION OF THE PLAN

9.01    **Impaired Classes to Vote.** Each holder of an Allowed Claim or Equity Interest in any impaired class shall be entitled to vote to accept or reject this Plan.

9.02    **Acceptance by Class of Creditors and Holders of Interests**. An impaired Class of Claims shall have accepted this Plan if this Plan is accepted by at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have voted to accept or reject this Plan. An impaired Class of Equity Interests shall have

accepted this Plan if this Plan is accepted by at least two-thirds in amount of the Equity Interests of such Class that have voted to accept or reject this Plan.

9.03 **Cramdown**. If any impaired class of Claims or Equity Interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such a plan of reorganization at the proponent's request if at least one impaired class has accepted the plan of reorganization (without including the acceptance of any "insider" in such class) and, as to each impaired class that has not accepted the plan of reorganization, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to rejecting impaired classes. The Debtor believes that it could satisfy the legal requirements for the "cramdown" of Classes 2.1, 2.2, and 3 Claims/Equity Interests.

IF ANY CLASS OF IMPAIRED CLAIMS FAILS TO ACCEPT THE PLAN IN ACCORDANCE WITH SECTION 1129(A)(8) OF THE BANKRUPTCY CODE, THE DEBTOR RESERVES THE RIGHT AND HEREBY REQUESTS NONCONSENSUAL CONFIRMATION OF THE PLAN IN ACCORDANCE WITH SECTION 1129(B) OF THE BANKRUPTCY CODE.

## ARTICLE X.

## TAX CONSEQUENCES OF THE PLAN

THE PLAN MAY HAVE SIGNIFICANT TAX CONSEQUENCES FOR ALL CREDITORS AND EQUITY HOLDERS OF THE DEBTOR. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WWITH HIS OR HER TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XI.

## RISK FACTORS

The restructuring of the Debtor contemplated by the Plan involves a degree of risk, and this Plan and Disclosure Statement contains forward-looking statements that involve risks and uncertainty. The Debtor's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Plan and Disclosure Statement. Holders of Claims and Equity Interests should consider carefully the following factors, in addition to the other information contained in this Plan and Disclosure Statement, before submitting a vote to accept or reject the Plan. The below risk factors should not be regarded as constituting the only risks involved in connection with the Plan and its implementation.

The Plan contains several material risks as follows:

1. Debtor may not be able to get approval of the tentative map proposed, although Debtor believes the map is likely to be approved as pre-approvals, and pre-zoning have already been granted.

2. The real property market could get worse and values decline even more than they have already.

3. Debtor may not be able to refinance as contemplated.

## ARTICLE XII.

## LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that a holder of a Claim in an impaired Class receive or retain under the Plan not less than the holder would receive or retain on account of the Claim if the debtor liquidated under Chapter 7 of the Bankruptcy Code. This test is often referred to as the "best interests of creditors" test.

To apply the "best interests" test, the Bankruptcy Court must first calculate the aggregate dollar amount that would be generated from a liquidation of the Debtor's assets in a hypothetical liquidation on the Effective Date under Chapter 7, including the amount of cash and other tangible assets held by such Debtor and the value of any projected recoveries on actions against third parties and other intangible assets held by such Debtor (the "Liquidation Value"). The Liquidation Value must then be reduced by the costs of liquidation, including administrative costs of the Chapter 7 estates and compensation to the Chapter 7 trustees and other professionals retained by the trustees (the "Liquidation Costs"). After estimating the Liquidation Value and the Liquidation Costs, the Bankruptcy Court must ascertain the potential Chapter 7 recoveries by Creditors and then compare those recoveries with the distributions offered under the Plan to determine if the Plan is in the "best interests" of Creditors in each Class.

If Debtor were to liquidate at this point, unsecured creditors would likely receive nothing because the real property would be sold for less than the amount owed to secured creditor CBB. Debtor believes that the Plan provides a distribution in excess of what would be achieved in a hypothetical Chapter 7 liquidation.

## ARTICLE XIII.

### ALLOWANCE AND DISALLOWANCE OF CLAIMS

13.01 **Disputed Claim.** A disputed claim is a claim that has not been allowed or disallowed, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

13.02 **Filing of Objections to Claims.** After the Effective Date, objections to Administrative Claims and all other claims shall be made, and objections to Administrative

Claims and all other Claims made before the Effective Date may be pursued, solely by the Reorganized Debtor (as the Estate Representative). Any objections to Administrative Claims and all other Claims made after the Effective Date shall be filed and served on the holders of such Administrative Claims and Claims not later than 60 days after the Effective Date or such later date as may be approved by the Bankruptcy Court via ex parte application.

       13.03   **Delay of Distribution on a Disputed Claim**. No distribution will be made on account of a disputed claim unless such claim is allowed.

       13.04   **Settlement of Disputed Claims**. The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE XIV.

## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

       14.01   **Assumed Executory Contracts and Unexpired Leases**. The Debtor assumes the following executory contracts and/or unexpired leases effective upon the effective date of this Plan as provided herein:

       Lease with Faith Farms LLC – Faith Farms leases the Property for farming and Debtor will use the income from Faith Farms to finish paying the property taxes as described herein.

       14.02   **Rejected Executory Contracts and Unexpired Leases**. The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under the above section, or before the date of the order confirming this Plan, upon the effective date of this Plan. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 15 days after the Effective Date.

# ARTICLE XV.

## EFFECT OF CONFIRMATION

15.01 **Revesting of Assets**. Subject to the provisions of the Plan and the Confirmation Order, the property of the Estate shall vest in the Reorganized Debtor on the Effective Date. As of the Effective Date, all such property shall be free and clear of all Claims, Liens and Equity Interests, except as otherwise provided in the Plan or the Confirmation Order. From and after the Effective Date, the Reorganized Debtor shall be free of any restriction imposed by the Bankruptcy Court, the Bankruptcy Code and the Bankruptcy Rules, other than the obligations set forth in the Plan.

15.02 **Discharge.** Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release, of all Claims. Except as provided in the Plan or the Confirmation Order, Confirmation discharges the Debtor and the Reorganized Debtor from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (c) the holder of a Claim based on such debt has accepted the Plan.

15.03 **Judgments Void**. Any judgment obtained before or after the Confirmation Date in any court other than the Bankruptcy Court shall be null and void as a determination of the liability of the Debtor or the Reorganized Debtor with respect to any debt discharged.

# ARTICLE XVI.

## GENERAL PROVISIONS

16.01 **Definitions and Rules of Construction**. The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the definitions stated in Exhibit A.

16.02 **Effective Date of Plan**. The effective date of this Plan ("Effective Date") is the eleventh business day following the date of the entry of the order of confirmation. But if a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

16.03 **Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

16.04 **Binding Effect**. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

16.05 **Captions**. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

16.06 **Retention of Jurisdiction**. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain and have all authority and jurisdiction as is allowed under the Bankruptcy Code and other applicable law to enforce the provisions, purposes, and intent of this Plan including, without limitation, matter or proceedings that relate to the following: claims objections and other determinations relating thereto; rights of the Debtor to property of the estate, any right, power or duty of the Debtor

under the Plan; matters related to the assumption or assignment of executory contracts and leases; resolution of any contested matter or adversary proceeding pending on the effective date of the Plan; modification of the Plan; and entry of a final decree.

16.07   **Post-Effective Date of Distributions**. Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

16.08   **Fractional Amounts**.  At Reorganized Debtor's option, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.

16.09   **Ex Parte Relief**. Upon ex parte application by the Debtor after the Confirmation Date or the Reorganized Debtor after the Effective Date, the Bankruptcy Court may enter such other and further orders as may be necessary or appropriate to instruct and direct the Debtor, the Reorganized Debtor, and others, and to facilitate the Distributions contemplated in the Plan.

16.10   **Governing Law**. Except to the extent that the Bankruptcy Code or other federal law is applicable or as provided in any Plan Document, the rights, duties and obligations of the Debtor, the Reorganized Debtor (in its own capacity or as Estate Representative pursuant to Section 1123 of the Bankruptcy Code), all Creditors and any other person arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California, without giving effect to California's choice of law provisions.

16.11   **Modification of Payment Terms**. At any time after the Effective Date, the Reorganized Debtor may modify the treatment of any Allowed Claim or Equity Interest in any manner adverse to the holder of such Claim or Equity Interest only with the prior written

consent of the holder whose Allowed Claim or Equity Interest treatment is being adversely affected.

16.12 **Setoff**. The Debtor and the Reorganized Debtor (in its own capacity and as Estate Representative pursuant to Section 1123 of the Bankruptcy Code) may, but are not required to, set-off or recoup against any Claim or Equity Interest and the payments of other Distribution to be made under the Plan in respect of such Claim, Claims of any nature whatsoever that arose before the Petition Date that the Debtor may have against the holder of such Claim or Equity Interest to the extent such Claims may be set off or recouped under applicable law, but neither the failure to do so nor the Allowance of any Claim or Equity Interest under the Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor (in its own capacity and as Estate Representative pursuant to Section 1123 of the Bankruptcy Code) of any such Claim that it may have against such holder.

16.13 **United States Trustee Fees**. The Reorganized Debtor shall pay all quarterly fees payable to the U.S. Trustee after Confirmation in connection with the Chapter 11 Case, consistent with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and 28 U.S.C. §1930(a)(6).

16.14 **Post-Confirmation Reports**. Not later than thirty (30) days after the end of each calendar quarter that ends after the Effective Date, the Reorganized Debtor shall file and serve upon the U.S. Trustee a quarterly post-Confirmation status report. Further reports shall be filed thirty (30) days after the end of every calendar quarter thereafter until entry of a Final Decree, unless otherwise ordered by the Bankruptcy Court.

16.15 **Final Decree**. After the Plan is substantially consummated, the Reorganized Debtor shall file a motion for a Final Decree, and shall serve the motion on the U.S. Trustee, together with a proposed Final Decree.

## ARTICLE XVII.

## AMENDMENT OR WITHDRAWAL OF THE PLAN

17.01 **Amendment of the Plan**. At any time before the Confirmation Date, the Debtor may alter, amend, or modify the Plan under Section 1127 (a) of the Bankruptcy Code. After the Confirmation Date and before substantial consummation of the Plan as defined in Section 1101(2) of the Bankruptcy Code, the Debtor may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission in, or reconcile any inconsistencies in the Plan or the Confirmation Order, and to implement such action as my be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Plan; provided, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

17.02 **Revocation or Withdrawal of the Plan**. The Debtor reserves the right to revoke or withdraw this plan at any time before the Confirmation Date. If the Plan is withdrawn or revoked, then the Plan shall be deemed null and void, and nothing contained in the Plan or any Plan documents shall be deemed a waiver of any Claims by or against the Debtor or any other Person in any further proceedings involving the Debtor.

Respectfully submitted,

ST. JAMES & HANFORD ENNIS
INVESTMENTS, LLC

By: _____
James Clark, Jr., Member Representative

Date: _2/1/10_____

LAW OFFICES OF PETER L. FEAR

By: _/s/ Peter L. Fear_____
Peter L. Fear